In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-1172 & 01-1176

In the Matter of:

Mexico Money Transfer Litigation

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 98 C 2407 & 98 C 2408--Rebecca R. Pallmeyer, Judge.

Argued September 7, 2001--Decided October 4, 2001


  Before Bauer, Easterbrook, and Manion,
Circuit Judges.

  Easterbrook, Circuit Judge.  "Send $300 to
Mexico for $15." This tag line, typical
of promotions by the two defendants
(MoneyGram and Western Union, plus its
subsidiary Orlandi Valuta), is at the
core of these consolidated class actions.
Plaintiffs contend that "for $15" is
fraudulent because the wire transfer
companies collect for their services not
only cash paid over the counter (the $15)
but also the difference between the
retail currency exchange rate quoted to
customers and the wholesale (interbank)
rate, for transactions of $5 million or
more, at which the defendants buy pesos.
Plaintiffs believe that the quoted price
must include the difference in foreign
exchange rates (the "fx spread", which
averages about $25 per transaction) or
that the defendants must at least reveal
the price that they pay for pesos, so
that the customers may work out the
spread for themselves. The classes sought
treble damages under the Racketeer
Influenced and Corrupt Organizations Act
(rico), 18 U.S.C. sec.sec. 1961-68, and
state anti-fraud laws. Class
representatives estimated that defendants
make as much as $300 million per year
from the fx spread, and they sought
treble this sum, over many years, as
damages. The proposed recovery thus ran
into the billions of dollars.
  The class got much less. The defendants-
-which contended that they have not
committed fraud because they reveal
exactly how many pesos will be delivered
in Mexico for exactly how many dollars--
were unwilling to pay very much on what

they deemed a weak claim. Moreover, to curtail the risk of fraud, they were unwilling to pay any cash except to class members who established their identities. For many members of the class, who are either not lawful residents of the United States or otherwise unwilling to submit personal details, mandatory identification would block relief. So the parties settled the case on other terms. Defendants agreed to disclose in future transactions and advertisements that there is a fx spread and that each defendant sets its own retail price of pesos, and to provide a toll-free telephone number from which customers can learn the going retail exchange rate. They also agreed to provide class members with coupons entitling them to $6 off the price of one future wire transfer for every transfer made since November 1993. (To simplify the exposition we disregard some additional details, which may be found in the district court's opinion.) The face value of coupons to be made available approaches $400 million. Finally, defendants agreed to pay about $4.6 million to organizations that assist the Mexican-American community; the parties call this "cy pres relief" in recognition of the fact that many class members will prove to be unidentifiable, will not claim their coupons, or will not use all coupons they receive. Finally, the defendants agreed to bear the expense of notifying the class (which normally must be borne by the representative plaintiffs, see Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974); White v. Sundstrand Corp., 256 F.3d 580 (7th Cir. 2001)) as well as the expense of administering the settlement; these outlays have been estimated at about $16 million, to which about $10 million in attorneys' fees will be added. After receiving notice under Fed. R. Civ. P. 23(c)(2), about 2,800 class members opted out, retaining their right to sue independently. Raul Garcia and Lydia Bueno intervened and objected to the settlement. The district court held a hearing under Rule 23(e), took testimony from the objectors and several expert witnesses, and later approved the compromise and entered the proposed consent decree. 2000 U.S. Dist. Lexis 18863 (N.D. Ill. Dec. 21, 2000).

According to the objectors, the court should not have certified a nationwide

class, or indeed allowed the litigation to proceed in Illinois (rather than California, where about a third of the class members reside). They also think that the class should have received more, and in particular should have been compensated in cash rather than coupons. Most of the objectors' arguments occasion little or no discussion. For example, their complaint about the location of the court not only overlooks the fact that rico authorizes nationwide service of process, see 18 U.S.C. sec.1965; Lisak v. Mercantile Bancorp, Inc., 834 F.2d 668, 671-72 (7th Cir. 1987), but also supposes that this suit has proceeded "in Illinois," as if the district court were exercising the power of that state. A state court might well have the necessary authority, see Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985), but no matter. This suit is in a United States District Court, which exercises the judicial power of the nation. All class members and defendants live within the territorial jurisdiction of the district court, given sec.1965. If both the representatives and the defendants are satisfied with venue (which they are) individual class members have no complaint. Only two of the other objections require treatment: the propriety of class certification in light of potential differences among state laws, and the adequacy of the defendants' payments.

The district court found that the class meets all requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation), plus the requirements of Rule 23(b)(3) (predominance of common over individual disputes and superiority of class disposition). It is hard to quarrel with these conclusions. The class is very large; each individual claim is small; the defendants handled all wire transfers the same way. Sometimes class treatment will be inappropriate even if all of these things are true, when recovery depends on law that varies materially from state to state. See, e.g., Isaacs v. Sprint Corp., 2001 U.S. App. Lexis 18324 (7th Cir. Aug. 14, 2001); Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001); In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293 (7th Cir. 1995). The class representatives avoided this pitfall in two ways: first, they confined

their theories to federal law plus aspects of state law that are uniform; second, they asked for certification of a class for settlement only, a step that the Supreme Court approved in Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997). Given the settlement, no one need draw fine lines among state-law theories of relief. By relying principally on federal substantive law, the representative plaintiffs followed the pattern of antitrust and securities litigation, where nationwide classes are certified routinely even though every state has its own antitrust or securities law, and even though these state laws may differ in ways that could prevent class treatment if they supplied the principal theories of recovery. See, e.g., In re Prudential Insurance Co. Sales Practice Litigation, 148 F.3d 283, 314-15 (3d Cir. 1998). Many opinions, of which Amchem is one, 521 U.S. at 625, give consumer fraud as an example of a claim for which class treatment is appropriate.

Nonetheless, the objectors imply, these class representatives are inadequate because they failed to investigate and deploy every potential state-law theory. Why they should have an obligation to find some way to defeat class treatment is a mystery. It is best to bypass marginal theories if their presence would spoil the use of an aggregation device that on the whole is favorable to holders of small claims. Instead of requiring the plaintiffs to conduct what may be a snipe hunt, district judges should do what the court did here: Invite objectors to identify an available state-law theory that the representatives should have raised, and that if presented would have either increased the recovery or demonstrated the inappropriateness of class treatment.

Our objectors believe that they have found such a theory, rooted in a California statute regulating the performance of financial intermediaries that offer international money transfers. See Cal. Fin. Code sec.sec. 1800-27. The objectors see a plausible claim in almost every subsection of this statute. The district court analyzed them all and found that none of the subsections gives the class any advantage over rico. We agree with that assessment. No purpose would be served by an exhaustive

analysis, for one appears in the district judge's careful opinion. An example will suffice. Section 1810(a) states: "Every licensee or its agent shall forward all moneys received . . . or give instructions committing equivalent funds to the person designated by the customer". The objectors see in this an obligation to transfer funds at the wholesale fx rate. We see no discussion of the difference between wholesale and retail prices for foreign currency; the section seems designed instead to require that the intermediary keep its promise to transfer the funds. Of course we may have missed some subtle interaction among the sections of the California Financial Code, but enforcement is not committed to judges in the first instance. It is committed to the California Department of Financial Institutions, see Cal. Fin. Code sec.sec. 1817-19, 1821, 1826, and the Department has never considered it necessary for regulated institutions to disclose (or hand over to the customer) the fx spread. We know this not only from the absence of regulations (and enforcement actions) but also from the testimony in the Rule 23(e) hearing of Stanley Cardenas, a former head of the Department. California gives substantial leeway to agencies in interpreting the laws they administer, see Dobbins v. San Diego County Civil Service Commission, 75 Cal. App. 4th 125, 131 (4th Dist. 1999), and since the Department's view corresponds to an ordinary-language read ing of the statute a claim under this law could not do the plaintiffs much good. (Plaintiffs responded to Cardenas's testimony with affidavits of legislators who supported the statute, but those views, offered away from the legislative halls and long after the law's enactment, are worthless. See Lindland v. United States Wrestling Association, Inc., 227 F.3d 1000, 1008 (7th Cir. 2000).) Any invocation of sec.1810(a) and the rest of California's money-transfer legislation would encounter another hurdle: The statute does not appear to support a private action, except for enforcement of a single subsection. See Cal. Fin. Code sec.1810.5(c). California respects a legislative decision to commit enforcement to an agency rather than private plaintiffs, see Moradi-Shalal v. Fireman's Fund Insurance Cos., 46 Cal. 3d 287, 300, 758 P.2d 58 (1988), making it hard to see how the class could have used

sec.1810 and its cousins to advantage. The class representatives cannot be branded as inadequate on account of their decision to abjure reliance on California law.

Let us turn, then, to the adequacy of the settlement. This is one of many class actions in which everyone other than the plaintiffs has been paid in cash. The attorneys got cash, the charitable organizations got cash, and the customers got coupons. That's enough to raise suspicions--especially because coupons serve as a form of advertising for the defendants, and their effect can be offset (in whole or in part) by raising prices during the period before the coupons expire. Maybe class actions would be prosecuted more vigorously if the class and class counsel had to accept the same coin. But the objectors do not say that the lawyers have been overpaid; they say that the customers have been underpaid. And that contention cannot be evaluated by stopping with the fact that compensation in kind is worth less than cash of the same nominal value. (Coupons are stand-ins for the wire transfer service, making them a form of in-kind payment.) Instead one must ask whether the value of relief in the aggregate is a reasonable approximation of the value of plaintiffs' claim. Prospective relief to which the defendants have agreed will alert class members to the fx spread and promote competition that may drive the retail price of pesos closer to the interbank price; that is not an outcome to be sneered at. And the coupons, too, have value.

Not the $400 million face value, surely. Experts estimated that about half of the coupons would be claimed, and 20% to 30% of those claimed would be used, implying a net value of $40 million to $60 million. That conclusion is supported by the analysis of other coupon settlements and some survey research exploring the likely behavior of this class. Persons who transfer money to Mexico do so an average of 14 times annually, providing ample opportunities to use the coupons independent of their effect in stimulating demand. The coupons can be used throughout a 35-month period, and, because they are transferable, even class members who do not again use defendants' services may obtain some value (if not by

selling them, then by giving them to relatives).

Were the class's claims worth more than $40 million, plus the cy pres relief, plus the value of the injunction? Like the district court, we think not--indeed, we think that the claims had only nuisance value (including their value in generating bad public relations for the defendants). This settlement is more in the nature of a PR gesture, coupled with a goal of freedom from a drumbeat of litigation (similar suits have been filed in many state and federal courts across the nation), than an exchange of money (or coupons) for the release of valuable legal rights. No state or federal law requires either currency exchanges or wire-transfer firms to disclose the interbank rate at which they buy specie, as opposed to the retail rate at which they sell currency (and the retail price is invariably disclosed). That is why the plaintiffs have been driven to make generic fraud claims. But since when is failure to disclose the precise difference between wholesale and retail prices for any commodity "fraud"?

Money is just a commodity in an international market. See Dunn v. CFTC, 519 U.S. 465 (1997). Pesos are for sale-- at one price for those who buy in bulk (parcels of $5 million or more) and at another, higher price for those who buy at retail and must compensate the middlemen for the expense of holding an inventory, providing retail outlets, keeping records, ensuring that the recipient is the one designated by the sender, and so on. Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods. The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees. The holder of a checking account may be promised a small interest rate (say, 2%) on the balance and is not told at what rate the bank lends these funds to its own customers. Nor need the bank, or an intermediary such as MoneyGram, explain

to customers how it profits from the float on funds it holds for a day or two between receipt and delivery. MoneyGram and Western Union revealed truthfully, and separately, the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico. Eachcustomer was told how many dollars in the United States would result in how many pesos delivered in Mexico. Nothing in this transaction smacks of fraud, so the settlement cannot be attacked as too low.

Affirmed