In Re COMPACT DISC MINIMUM ADVERTISED PRICE ANTI-TRUST LITIGATION

No. MDL 1361, 200MD1361PH.

United States District Court, D. Maine.

Dec. 3, 2003.

John Brautigam, Maine Assistant Attorney General, Augusta, ME, Liaison Counsel for the Plaintiff States.

Linda Gargiulo, Assistant Attorney General, New York, NY, Lizabeth Leeds, Assistant Attorney General, Tallahassee, FL, Lead Counsel for the Plaintiff States.

Alfred C. Frawley, III, Esq., Gregory P. Hansel, Esq., Preti, Flaherty, Beliveau & Haley, LLC, Portland, ME, Liaison Counsel for the Private Plaintiffs.

Joseph C. Kohn, Esq., Michael J. Boni, Esq., Kohn, Swift & Graf, PC, Philadelphia, PA, Lead Counsel for the Private Plaintiffs.

Michael Jaffe, Esq., Wolf Haldenstein Adler Freeman & Herz, LLP, New York, NY, Counsel for the Trowbridge Plaintiffs.

William J. Kayatta, Jr., Esq., Clifford H. Ruprecht, Esq., Pierce Atwood, Portland, ME, Liaison Counsel for the Distributor Defendants.

Joseph H. Groff, III, Esq., Jensen, Baird, Gardner & Henry, Portland, ME, Liaison Counsel for the Retailer Defendants.

## DECISION AND ORDER ON PROPOSED AMENDED SETTLEMENT AGREEMENT AND ATTORNEY FEES

HORNBY, District Judge.

### I. SUMMARY

I rejected a proposed settlement for music club customers on June 13, 2003. The proposed 50% discount program lacked significant value, when compared to the many other offers available to music club members. The Proposed Amended Settlement offers a 75% discount (with free shipping and handling), transferability of the discount, and accumulation of music club bonus points. After the motion hearing on November 10, 2003, I APPROVE notice, CERTIFY the class, APPROVE incentive awards to the named plaintiffs, and APPROVE the Proposed Amended Settlement Agreement among private plaintiffs, music clubs and distributors concerning music club sales. I DEFER action on the request for attorney fees and expenses. I refer the reader to the legal and factual analysis in my original order. *See In re Compact Disc Minimum Advertised Price Antitrust Litigation,* 216 F.R.D. 197 (D.Me.2003). I supplement the reasoning and findings made there only as necessary.

### II. NOTICE AND CLASS ACTION

I reinstate the findings and conclusions concerning notice and class certification stated in my previous order. *See id.* at 218–19. The initial notice program provided individualized notice by mail to 8.1 million potential class members identified from the membership records of the music club defendants, *id.* at 218, as well as publication notice. *Id.* at 219. The notice described the class, the litigation, how an affected consumer could opt out, and di-

rected individuals seeking additional information to a website address. *Id.* at 218. I found that this initial notice program was "completely adequate and appropriate for this class action and fulfilled all the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure." *Id.* at 219.

With respect to the improvements in the proposed settlement that occurred after my June 13, 2003, rejection, I approved a notice arrangement by which the music clubs' informational websites were continuously updated and maintained to reflect the terms of the amended settlement and an informational toll-free number was continued. *See* Order Granting Preliminary Approval of Proposed Settlement, at 6 (Docket No. 304). Objectors and opt-outs received written notice of the amended settlement. *Id.* I conclude that such notice was sufficient because it would be too burdensome and costly to repeat a mailing to the over eight million class members informing them of favorable changes in the proposed amended settlement, especially to those who never objected to the first proposed settlement. The relevant caselaw supports limited notice to non-objectors when the class members have already received an earlier form of notice. *See, e.g., In re Auction Houses Antitrust Litig.,* 138 F.Supp.2d 548, 549 n. 3 (S.D.N.Y. 2001); *Harris v. Graddick,* 615 F.Supp. 239, 244 (M.D.Ala.1985). The music clubs will now notify class members that the amended settlement has been approved, and class members will receive their vouchers by a direct mailing. *See id.* at 6–7. (Class members who received only publication notice may obtain vouchers through music club websites or by calling the toll-free number. Amended Stipulation of Settlement, at 13 (Docket No. 292).) For the reasons stated above, I therefore APPROVE notice for the Amended Proposed Settlement. I also CERTIFY the class for the reasons stated in my original order. *See In re Compact Disc,* 216 F.R.D. at 219.

## III. FAIRNESS, REASONABLENESS AND ADEQUACY OF THE PROPOSED AMENDED SETTLEMENT

Under this topic I consider the factors identified in my Order of June 13, 2003.

### A. VALUE OF THE SETTLEMENT

The Proposed Amended Settlement generates $1,025,000 in cash, and a 75% discount[1] (plus free shipping and handling, and bonus points) for music club members who purchased CDs from the defendant music clubs during the class period. The parties propose to devote the cash to the plaintiffs' costs of notice, incentive payments of $5,000 each to the two named class representatives and the remainder to attorney fees and expenses. Thus, like the original proposed settlement, the only value to class members is the discount.[2] The Proposed Amended Settlement will provide vouchers to music club members giving them the opportunity to purchase a

---

1. Applicable to one to three CDs, depending on the number of CDs purchased during the class period.

2. Given the amount of cash likely to be available under the best of circumstances, it is not practical to distribute it among the over eight million members of the class, and an all-cash settlement is not required. A cash settlement would not reach every injured member and administratively could not be calculated reliably to account for the actual loss suffered by each class member. *See In re Compact Disc,* 216 F.R.D. at 208. Moreover, the claims have modest value at best, as I said in my previous order; compare *Mexico Money* where a settlement was approved in light of the fact that the class members' claims had questionable value, although in that case no other competing discounts were available. *In the Matter of: Mexico Money Transfer Litigation,* 267 F.3d 743, 749 (7th Cir.2001) ("Nothing in this transaction smacks of fraud, so the settlement cannot be attacked as too low.").

regular price CD at 75% off the regular music club price, with no shipping and handling charges, on one to three CDs depending on the quantity of CDs previously purchased during the class period. The Proposed Amended Settlement will make each CD cost, on average, $4.50 (75% off $17.98 with no charge for shipping and handling). *See* Pls.' Mem., Expert Report of Linda McLaughlin, Tab 1 at 3 (Docket No. 328). These vouchers are fully transferable, even to non-class members, and users of the voucher will be entitled to the normal "bonus points" of the music club in which the user is a member to the same extent that such a user would be entitled to "bonus points" for purchases from the music club in the ordinary course of business.

■ The discount increase (from 50% to 75%) adds identifiable value to the settlement. A 75% discount is consistent with the best discount frequently used by music clubs—"Buy 1, Get 3 Free." *See id.* at 33, Expert Report of Linda McLaughlin, Tab 1 at 5 n. 8. Yet the settlement voucher requires the purchase of only one CD at the 75% discount (as compared to obtaining four CDs by purchasing one at the average full-price rate of $17.98, plus shipping and handling). In addition, these

vouchers can be sold or given to friends, or even charities or clubs, and the CDs purchased with the vouchers allow music club members to earn bonus points. This discount program does not face some of the problems of other coupon cases. For example, the price of the discounted CD is not so high as to foreclose use of the voucher at all. *Contra In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 808–810. *See also In re Compact Disc*, 216 F.R.D. at 220 n. 58; *O'Keefe v. Mercedes–Benz USA, LLC*, 214 F.R.D. 266, 303 (E.D.Pa.2003).

The total value of the voucher program will be equal to the value of the voucher multiplied by the number of vouchers actually used. One could argue the value of the voucher to be, on average, $13.49 (75% of $17.98). Music clubs, however, frequently offer one CD at a cost of $5.99 plus $2.79 for shipping and handling.[3] Therefore, I use that point of comparison to value the voucher. A $4.50 CD with free shipping and handling (the proposed amended settlement discount) is $4.28 better than the best general discount ($8.78 after shipping and handling).[4]

If the expert reports and corporate affidavits are accurate, the voucher redemption rate will be 15–20%.[5] The plaintiffs

**3.** There is evidence to indicate that music clubs occasionally make offers for the purchase of one CD at a cost of $4.99 plus shipping and handling. *See* Pls.' Mem., Decl. of Sharon Siegel, Tab 2 at 5, Aff. of Ann Marie Resnick, Tab 3 at 4 (Docket No. 328). I choose the $5.99 figure because various objectors to the original 50% discount program identified this as a readily available discount from BMG Music Club. *See id.*, Tab 4. BMG Music Club members make up 6.4 million of the 8.1 million class members. *Id.*, Expert Report of Linda McLaughlin, Tab 1 at 2–3. Choosing the other discount, however, would not lead me to reject the amended settlement.

**4.** The plaintiffs argue that the value of each voucher is $6.35, attempting to account for the fact that some vouchers will be good for a

75% discount on two or three CDs as opposed to just one CD. *See id.*, Expert Report of Linda McLaughlin, Tab 1 at 7.

**5.** Sharon Siegel, Vice–President of BeMusic, believes the figure to be 15% (*Id.*, Decl. of Sharon Siegel, Tab 2 at 6); Linda McLaughlin, an expert economist calculates the rate at 17% (*Id.*, Expert Report of Linda McLaughlin, Tab 1 at 2; Addendum to Expert Report of Linda McLaughlin (Nov. 20, 2003) (Docket No. 331)); and Ann Marie Resnick, Vice President of Marketing for Music Clubs for Columbia House, states that Columbia House has 1,704,771 active members and anticipates sending out 350,000 CDs as a result of the voucher (just over 20% of their members) (Pls.' Mem., Aff. of Ann Marie Resnick, Tab 3 at 2, 6 (Docket No. 328)).

forcefully argue that the redemption rate will be 17% or greater, base upon a detailed econometric analysis. *See* Addendum to Expert Report of Linda McLaughlin (Nov. 20, 2003) (Docket No. 331). This figure is derived from data supplied by Columbia House and BMG Music Service on the responsiveness of music club members to offers sent to members every three or four weeks ("cycle offers"). *Id.* at 1. Using this data, the plaintiffs' expert extrapolated the redemption rate of the settlement vouchers based on the cost of CDs and response rate to the cycle offers, the cost of a CD when using a settlement voucher, the distribution of the vouchers (*i.e.*, what percentage of vouchers will be for one CD versus two or three CDs), and the duration for which the vouchers are redeemable (here, six months). *Id.* at 2–3. But using even the lowest figure suggested—15%—1.215 million class members (15% of the 8.1 million class members) would use the settlement vouchers resulting in a minimum total value of $5.2 million ($4.28 × 1.215 million).[6]

## B. Prospects of the Case

I went into some detail in my previous order as to how the odds of winning the lawsuit for music club members were extremely slim. *In re Compact Disc*, 216 F.R.D. at 221. I do not repeat that exposition here. Suffice it to say that I am satisfied that this settlement does provide value to the class members and that it is better than nothing, the probable outcome of continuing the lawsuit. How much value it provides will depend on the rate of exchanging the vouchers, an issue I return to under Attorney Fees.

## C. Reaction of the Class

The response to the amended settlement has been generally positive. No individuals objected to the Proposed Amended Settlement at the November 10, 2003 final fairness hearing. Some original objectors withdrew their objections and some potential class members withdrew their opt-outs.[7] Only David Plimpton of Cape Elizabeth, Maine, objected in writing. *See* Pls.' Mem., Letter from David Plimpton of 10/6/03, Tab 7 (Docket No. 328); additional letter of 11/28/03 (Docket No. 333).[8] Given the size of the class, the number of objections is miniscule.

## D. Stage of the Litigation

The case is being settled after sufficient time for significant discovery and evaluation. Extensive document discovery began immediately after the Judicial Panel of Multidistrict Litigation transferred this tag-along case to the District of Maine. The discovery performed during this litigation involved the review of hundreds of thousands of documents giving the parties

---

**6.** According to the expert valuation figure of $6.35 per voucher (recognizing that some vouchers will be good for more than one CD) and the 17% redemption rate, the value of the vouchers would rise to $8.8 million. *See id.*, Expert Report of Linda McLaughlin, Tab 1 at 7.

**7.** This group includes William R. Weinstein who states that the proposed amended settlement provides real, substantial and quantifiable benefit to the class members. *See id.*, Letter from William Weinstein of 10/2703, Tab 8 at 1. I draw no inferences about the quality of the proposed amended settlement from these withdrawals as I am aware that

objections and then withdrawals can be made in the hope or on the promise of financial benefit.

**8.** Because he did not attend the hearing. Mr. Plimpton is unaware that the supplemental report of the expert was occasioned by questions that I asked at the hearing and that I granted permission then to provide the supplemental report. I have not treated Edward F. Dijeau's (Union City, California) characterization of the settlement as an objection in light of his September 22, 2003 request to be excluded from the class and settlement. *See id.*, Letters from Edward F. Dijeau of 9/22/03.

ample opportunity to learn about the prospects or pitfalls of their respective cases.

### E. QUALITY OF COUNSEL

Class counsel are capable and have worked long and hard hours first in the preparation of this case and then in the settlement agreement. *In re Compact Disc,* 216 F.R.D. at 222.

### F. CONDUCT OF THE NEGOTIATIONS

Negotiations for the original settlement went on for a period of five months. After the original settlement was rejected, the parties entered into renewed settlement negotiations, reaching an Amended Stipulation of Settlement, dated July 24, 2003. The negotiations were arm's length.

For the reasons stated above, I therefore **APPROVE** the Proposed Amended Settlement Agreement among private plaintiffs, music clubs and distributors concerning music club sales.

## IV. INCENTIVE AWARDS

■ The Proposed Amended Settlement would pay $5,000 to each of the two named class representatives in this case. Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit. *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir.1998). In determining whether such an award is warranted, I may consider the actions plaintiffs have taken to protect the interests of the class, the degree to which the class has benefited from those actions, the amount of time and effort the named plaintiffs expended in pursuing the litigation, *id.,* and any negative effects on the named plaintiffs.

■ The named plaintiffs in this case did "put forth some effort in pursuit of the class." *See Lachance v. Harrington,* 965

F.Supp. 630, 652 (E.D.Pa.1997). They worked with experienced counsel, were willing to prosecute the case, and helped confer a benefit upon the class. In July 2001, the named plaintiffs responded to interrogatories and document requests. Decl. of Michael Jaffe ¶ 20, at 9 (Docket No. 329). Each turned over her entire collection of CDs. *Id.* ¶ 59. Their depositions were taken, respectively, on July 14, 2001 in Florida, and July 31, 2001 in New York City. *Id.* They did not expose themselves to any apparent risk (unlike some cases, such as employment, where retaliation may occur). Although the bulk of the time in this case was spent by the lawyers, rather than the class representatives, there is "sufficient support in the caselaw to support ... a minimal award." *Lachance,* 965 F.Supp. at 652 (approving an incentive award of $1,000 where named plaintiffs retained counsel and responded to discovery requests). *See also In re SmithKline Beckman Corp. Sec. Litig.,* 751 F.Supp. 525, 535 (E.D.Pa.1990) (court approved award of $5,000 to representative plaintiffs for conferring a monetary benefit on a large class). I conclude that the proposed amount is too generous, however, for what these two individuals did. I **APPROVE** incentive payments of $2,500 each to the two named class representatives.

## V. ATTORNEY FEES

I am aware of the criticism that has been leveled at class settlements where the cash goes to the lawyers and the class members get only a coupon of dubious value. *See, e.g., Mexico Money,* 267 F.3d at 748; *O'Keefe,* 214 F.R.D. at 303. In this case, after paying notice expenses and the incentive payments to the named plaintiffs, the plaintiffs' lawyers seek the remainder of the $1,025,000 cash for their expenses and attorney fees (a net of no greater than $851,739.85 [9]). Recognizing that percent-

9. The remainder of $851,739.85 was calculat-    ed using publication notice costs of

age of funds is the preferred method of assessing fees in a settlement like this, with lodestar analysis providing only a check, *see In re Compact Disc.* 216 F.R.D. at 215–16, I can effectively gauge appropriate attorney fees only if I know the total value of the settlement. But although I am satisfied that the coupon settlement has value to the class, I am not confident of the redemption rate that has been projected and thus of the settlement's total value. Therefore, I have determined to delay award of attorney fees until experience shows how many vouchers are exercised and thus how valuable the settlement really is.[10]

■ The exercise period expires after six months, so this is not an inordinately long extension. Indeed, if the enthusiastic projections are correct, the parties may be able to demonstrate enough success substantially sooner. The possible outcomes cover this range: (1) although I have determined that the settlement has value and deserves approval, it turns out to be minimal value and therefore does not justify an

award of fees; the remaining amount should go to one or more music-related charities, at my discretion, as provided for in the Amended Stipulation of Settlement;[11] (2) the number of vouchers exercised shows that the settlement has great value and justifies an award of all the attorney fees sought; (3) the voucher exercise rate justifies an attorney fee award somewhere between zero and the full amount. I recognize that a delay of the fee award may be unusual, but I see nothing in the case law that requires me to determine the fees immediately upon settlement, and I believe there is good reason here for a reasonable delay.

## VI.  CONCLUSION

I will therefore enter judgment accordingly, largely as provided in the form of judgment proposed.[12]

So Ordered.

---

$57,231.50, expert costs of $86,028.65, and a toll-free number expense of approximately $25,000, all as of November 2, 2003. Decl. of Michael Jaffe ¶ 49, at 18–19 (Docket No. 329). In the end, $851,739.85 is too high as it was derived by freezing toll-free number and expert expenses as of November 2, 2003. *See id.* ¶ 49, at 19. The toll-free number expense is expected to grow much higher as class members use the toll-free line to request vouchers, *id.* ¶ 49, at 18, and expert expenses will increase by virtue of the submission of the Addendum to Expert Report of Linda McLaughlin (Nov. 20, 2003).

10.  The agreement provides that, upon written request, the music clubs shall provide plaintiffs' counsel with a quarterly accounting of the use of the vouchers, consisting of a statement from each music club of how many vouchers have been processed and how many CDs have been shipped in response to the vouchers. Amended Stipulation of Settlement § 3.5, at 14 (Docket No. 292). Thus, there is already a vehicle for obtaining this information.

11.  Section 8.2 of the Amended Stipulation of Settlement states: "To the extent any amount remains in the Plaintiffs' Notice/Fee/Incentive Fund after the Court rules on the Fee and Expense Application, such amount shall revert in equal parts to Defendants Sony, BMG Music, EMI, Universal and Warner within 10 days after the Court's ruling, provided, however, that in its discretion, after hearing from all parties, the Court may order that, in lieu of returning such funds to these Defendants, the funds be contributed to one or more music-related charities, including but not limited to charities that the parties shall identify for the Court's consideration within thirty (30) days of the Court's order." *Id.* § 8.2, at 19–20.

12.  I will not include the language that protects everyone from Rule 11 claims. I know of no basis for Rule 11 claims, but I consider it inappropriate to include a general protection in the abstract.