FOURTH DIVISION
March 29, 2007

1-06-0878


EDWARD SANCHEZ, Individually and on       )      Appeal from the
behalf of all others similarly situated,)      Circuit Court of
                                          )      Cook County.
          Plaintiff-Appellant,            )
                                          )
               v.                         )
                                          )
AMERICAN EXPRESS TRAVEL RELATED           )
SERVICES COMPANY, INC.,                   )
                                          )      Honorable
                                          )      Anthony L. Young,
          Defendant-Appellee.             )      Judge Presiding.


     PRESIDING JUSTICE QUINN delivered the opinion of the court:

     Plaintiff Edward Sanchez appeals from the circuit court's

order granting summary judgment for defendant American Express

Travel Related Services, Inc.  In this court, Sanchez contends

that a genuine issue of material fact existed and, thus, the

circuit court erred in granting summary judgment.  For the

reasons that follow, we affirm.

                         BACKGROUND

     Defendant operates a currency exchange service to consumers

in branches across the United States through which defendant

converts foreign currency into United States dollars and vice

versa.  Defendant charges consumers a fee to convert their

currency.

The record discloses that on September 16, 2004, plaintiff entered defendant's office at 55 West Monroe Street in Chicago, Illinois to exchange 1,050 Mexican pesos for U.S. dollars. The rate displayed on the office electronic board was 0.080936652 United States dollars for each Mexican peso. The board did not disclose the exchange rate at which defendant exchanged the currency. The financial service representative (FSR) informed plaintiff as to the exchange rate posted on the board and explained that plaintiff would be charged a $3 service fee for the transaction. Plaintiff agreed to the exchange rate and the service fee.

The FSR then processed plaintiff's transaction and provided plaintiff with a receipt of the transaction. The receipt disclosed that at an exchange rate of 0.080936652 United States dollars per Mexican peso, plaintiff's 1,050 Mexican pesos yielded him $84.98. The receipt further showed that after defendant subtracted its $3 processing service fee, plaintiff received a total of $81.98. The $3 service fee was listed twice on the receipt, once as "fee" and once as "total fees." Plaintiff reviewed this receipt before leaving defendant's office.

On December 30, 2004, plaintiff filed a complaint against defendant in which he alleged that defendant operated a "Money Skimming Scheme." The complaint stated:

"In addition to profiting by charging each of
its customers a 'fee' for the Service,
American Express also profits by skimming the
difference between the exchange rate it
receives and the exchange rate it uses to
convert a customer's currency.  The
difference between the two exchange rates is
a hidden, undisclosed charge it assesses to
each of its customers that use the Service
(hereafter 'the Money Skimming Scheme')."

Plaintiff argued that this alleged practice violated the Illinois
Consumer Fraud and Deceptive Business Practices Act (Act) (815
ILCS 505/1 et seq. (West 2004)).  Plaintiff further asserted that
"the receipt was designed to conceal the fact that American
Express actually received a significantly higher exchange rate
for itself than the 0.080936652 United States dollars per Mexican
Peso it exchanged [plaintiff's] 1,050 Pesos for."  Plaintiff
concluded that defendant received more than the $84.98 United
States dollars that it disbursed to plaintiff for his 1,050
Mexican pesos prior to the $3 service fee.  Thus, plaintiff
argued that defendant received a hidden fee in addition to the $3
service fee it listed on the receipt.

Thereafter, defendant filed a motion to dismiss pursuant to

1-06-0878

section 2-615 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2004)) and a memorandum of law in support of its motion on March 8, 2004. Relying on In re Mexico Money Transfer Litigation, 267 F.3d 743 (7th 2001), defendant contended that, as a matter of law, it was not required "to disclose the rates at which it purchases foreign currency or its profits from the 'spread.'" Thus, defendant argued that plaintiff could not state a claim for fraud under the Act because it could not establish that defendant committed a deceptive practice. In addition, defendant argued that plaintiff could not adequately plead proximate cause or damages.

On April 12, 2005, plaintiff filed a response to defendant's motion to dismiss in which he argued that Covarrubias v. Bancomer, 351 Ill. App. 3d 737 (2004), governed the outcome of the case at bar. His contention was that according to this court's ruling in Bancomer, defendant's failure to disclose that it received a greater profit than the $3 service transaction fee constituted a deceptive practice under the Act. Plaintiff also contended that he sufficiently pled proximate cause and damages.

On May 13, 2005, the circuit court denied defendant's motion to dismiss. Thereafter, plaintiff filed a motion for class certification and defendant filed its response. The circuit court never ruled on this motion, and thus it is not a matter

-4-

1-06-0878

before this court.

On November 14, 2005, defendant filed a motion for summary judgment. In support, defendant attached the affidavits of Linda Teter and Vicki Norton dated November 10, 2005, and November 11, 2005, respectively. Both Teter and Norton were employees of defendant.

Teter averred that she was the director of service delivery for defendant and was working on special projects until her retirement at the end of 2005. She then stated:

> "American Express charges customers that utilize the Exchange Service a fee per currency exchange transaction. Each individual [travel service office] TSO manager has the ability to decide at what amount to set the fee. This decision is based upon, among other things, the level of competition from other Exchange Service vendors in the area. Accordingly, the fees charged by each individual TSO vary by market and location. In setting the fee, American Express always takes care to ensure that its fee is competitive from a customer perspective."

1-06-0878

She further explained that the transaction fee on September 16, 2004, at the Monroe Street TSO was $3, which employees were trained to communicate to customers.

Teter then averred:

> "American Express does not state what its net 'profit' is in providing the Exchange Service.  In addition, American Express does not state to the customer what its 'cost' is for what is sold (in this case, the cost of the currency that it sells to customers). The fee listed on the customer's receipt is not identified as a 'net fee' and there is no language on the receipt advising or indicating to customers what American Express's 'profit' is on any individual transaction.  Rather, American Express accurately discloses the cost to the customer -- that is, the retail exchange rate applied and the fee."

Teter further explained that American Express could not anticipate its "profit" for each individual transaction.  She stated:

> "In processing each customer transaction,

-6-

American Express does not take the currency exchanged in an individual transaction by a customer at a retail exchange rate and convert such currency at a wholesale rate in an individual transaction. Rather, American Express buys foreign currencies in bulk at a wholesale rate, and uses these bulk funds to pay out the selected currency, as the individual transactions occur. American Express FSRs have no information regarding the wholesale rate at which American Express buys and sells currency in bulk, and FSRs have no information regarding any potential profit from any individual transaction. Because customers do not trade currency in these large volumes, wholesale currency rates are not available to them."

Norton averred that her position with defendant was manager, personal travel and financial services. In that position, she was responsible for overall operations of owned American Express TSOs in Illinois, including the TSO located at 55 West Monroe Street in Chicago. She confirmed that on September 16, 2004, plaintiff exchanged 1,050 Mexican pesos for United States dollars

at a "buy" exchange rate of 0.080936652 United States dollars per Mexican peso.  That exchange rate yielded plaintiff $81.98 after a $3 transaction fee was subtracted.  Norton stated that the $3 fee was noted twice on plaintiff's receipt, once as a "fee" and once as "total fees."  She further explained:

> "The fee is not, and was not, intended to lead customers to believe that American Express only makes a profit of $3 for the Exchange Service, and American Express agents make no such representation to customers. Rather, the fee is clearly disclosed as a charge separate and apart from, and in addition to, the retail exchange rate that is quoted to the customer and applied to the transaction."

On November 3, 2005, the parties deposed plaintiff. Plaintiff testified that he decided to bring this suit when he learned that defendant "[makes] money off of the exchange, the currency exchange."  He added, "They stated one fee and there was a bigger fee."  Upon further questioning, plaintiff stated, "They charged more for my exchange than they told me they were charging."

Plaintiff acknowledged that he previously worked for Legal

Helpers.  During that time, he shared office space at 444 North Wells Street in Chicago with the attorney representing him in this case.

Plaintiff then testified that on September 16, 2004, he sought to exchange Mexican pesos left over from a vacation for United States dollars.  Although he knew of other currency exchanges in the city, he did not visit another foreign currency exchange merchant prior to entering defendant's office.

Plaintiff remembered seeing an exchange rate board in the office, but did not recall whether he saw the "buy" rate.  He also did not remember whether he asked the FSR what the exchange rate for Mexican pesos was on that day.  Despite not recalling many of the details of the exchange, plaintiff confirmed that he counted his money after exchanging his Mexican pesos for United States dollars and stated it was an accurate exchange.  He said that he did not expect to receive anything other than the $81.98 he received from the FSR.

During the deposition, plaintiff acknowledged that other than conversations with his counsel, he had no basis for his belief that on September 16, 2004, he paid more in connection with his currency exchange that he had agreed to pay.  He further confirmed that other than conversations with his attorney, he had no basis for his allegation that defendant skimmed and stole some

of his money.  Plaintiff neither decided to hire an attorney nor felt he had to bring a lawsuit against defendant until he had discussions with his present attorney.

Subsequently, the parties deposed Teter on January 27, 2006. Teter disclosed that she retired four weeks prior to her deposition.  She further testified that she had been deposed twice before due to her expertise in foreign currency.  She stated, however, that her expertise as to foreign currency buying and selling procedures was limited to defendant's policies. Teter then testified as to defendant's procedures for conducting buy and sell transactions with customers.  She distinguished the transactions in that, in a buy transaction, defendant receives foreign currency from a customer in exchange for United States dollars.  Conversely, in a sell transaction, defendant provides a customer foreign currency in exchange for United States dollars.

Teter stated that during a buy transaction, as occurred in the case at bar, the FSR first asks the consumer as to which currency he wishes to exchange if not identified and how many increments of that currency he wants to transact.  The FSR then quotes the consumer the applicable rate of exchange in effect for that business day, the transaction or service fee, and the United States dollar equivalent for that transaction.  The FSR does not, however, inform the customer for what amount the defendant

purchased the currency it sells to a customer. Teter stated that the FSRs do not know the rate at which defendant buys currency. She further asserted that, as in other retail establishments, even if the FSR possessed the information, he or she would not disclose it to the customer.

With respect to an individual transaction, Teter explained that defendant does not generate any revenue on a single "buy" transaction other than the service fee. Rather, revenue does not arise until defendant resells the currency on a "sell" exchange. The revenue generated from these transactions is not calculated for each individual transaction, but is determined on a teller (TSO) till level for all foreign currency cash notes that would have been sold on a given day.

Teter stated that all currencies, notes, and cash, which are sold and bought on different days at varying exchange rates, are lumped together. As such, certain currencies could sit in a TSO till for a number of days before that exact currency was involved in another transaction. Thus, a weighted cost average determines revenue generated. Teter further testified that the constant varying of exchange rates affects the total revenue generated.

Teter again confirmed that defendant charges a customer a transaction fee per currency exchange. She explained that the fee varied between defendant's offices and markets. However,

Teter stated, "Well as I understand the process, once the fee is changed in the express change system, then it becomes constant in terms of how it appears on the rate board and in express change." She further asserted that the fee became "constant" for a particular office.

Teter also testified that, as stated in her affidavit, FSRs are trained to disclose a transaction fee to customers. During training, FSRs are informed that defendant purchases currency at a lower wholesale rate than that used in transactions involving sales of the same currency. She did not know whether FSRs are told to inform customers of the difference in exchange rates.

Teter explained that each TSO orders foreign currency cash notes from defendant's United States money center in Las Vegas. The money center then receives foreign currency notes from its England office, which is the Global Foreign Exchange, and supplies the TSOs with their orders. Each TSO has set limits that it must stay within on a daily basis. Teter confirmed that the Global Foreign Exchange is responsible for purchasing currency. In addition, the Las Vegas office buys back excess currency cash notes from TSOs, which are then either returned to the Global Foreign Exchange or distributed to other TSOs.

When asked as to how defendant profited from its business, Teter stated, "Our TSOs will buy currency that they acquire via

the Las Vegas money center.  Those currencies are then marked up a percentage and sold to retail customers."  She also testified that fees are assessed to retail customers for transactions.

Teter explained that the "percentage markups" are determined by local market managers who are responsible for the operation of TSOs within their given region.  She stated that defendant had a system of tiers across the United States to determine markup rates.  Each local market manager then determined the tier rate to apply in a given market based on the local competition.  Teter stated that the tier would reflect "the spread rate on a percentage basis."

Teter acknowledged that the retail rate at which defendant buys currency from a customer differs from the rate at which it sells the currency.  She then confirmed that defendant's goal was to profit from the spread rate, which is the difference between the defendant's wholesale rate and plaintiff's retail rate.

Teter further testified that the words "total fees," as used in plaintiff's transaction, "reflect the total amount of fees that this particular customer paid to [defendant] for the transactions that are listed in express change."  She confirmed that plaintiff paid a "total fee" of $3 for his transaction.  She also again stated that defendant did not generate any other revenue from its individual transaction with plaintiff.  That

-13-

said, defendant may have generated revenue in addition to the $3 fee if it sold the pesos it bought from plaintiff at a later date for a better rate. Teter stated, "I would hope that we would generate additional revenue over and above the $3 on this 1,050 pesos that were sold to us on the 16th of September. That would be my hope."

Thereafter, on March 21, 2006, the circuit court granted defendant's motion for summary judgment following the parties' respective arguments. In granting summary judgment, the circuit court stated:

> "Counsel, when I ruled on the Motion to Dismiss, I denied the Motion to Dismiss because I can only grant such a motion on the face of the Complaint where there was no set of facts that the plaintiff could prove that would allow them to recover. And if you could introduce evidence that somehow portrayed this $3 fee as the absolute net fee, then of course, you could recover.
>
> But since the Motion to Dismiss, you have taken discovery. The plaintiff's deposition has been taken, and the plaintiff is unable to characterize this fee as the net

fee or point to any misrepresentation made by American Express.  You have also been unable to establish that had the plaintiff transacted business elsewhere, there would have been a different result.  So I am going to grant the Motion for Summary Judgment."

Plaintiff now appeals.

ANALYSIS

This court reviews a circuit court's order granting summary judgment *de novo*.  <u>Novakovic v. Samutin</u>, 354 Ill. App. 3d 660, 666 (2004).  Summary judgment is appropriate where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2004). The trial court must construe the record against the moving party and may only grant summary judgment where the record shows that the movant's right to relief is clear and free from doubt. <u>Samutin</u>, 354 Ill. App. 3d at 666.  That said, the moving party is entitled to judgment as a matter of law where the nonmoving party fails to make a sufficient showing of an essential element of the case where the nonmoving party bore the burden of proof.  <u>Swisher v. Janes</u>, 239 Ill. App. 3d 786, 794 (1992).

1-06-0878

In this case, plaintiff alleged that defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Act) (815 ILCS 505/1 et seq. (West 2004)) by misrepresenting the profit that it generated from the September 16, 2004, transaction in which plaintiff exchanged Mexican pesos for United States dollars.  The Act is a "regulatory and remedial statute intended to protect consumers, borrowers, and business people against fraud, unfair methods of competition, and other unfair and deceptive business practices."  Johnson v. Matrix Financial Services Corp., 354 Ill. App. 3d 684, 690 (2004).  To establish a claim under the Act, plaintiff had to show that defendant committed a deceptive act or practice, that defendant intended for plaintiff to rely on the deception, and that the deception occurred in the course of conduct involving trade or commerce.  Johnson, 354 Ill. App. 3d at 690.  The Act defines a deceptive act in pertinent part as

> "the use or employment of any deception,
> fraud, false pretense, false promise,
> misrepresentation or the concealment,
> suppression or omission of any material fact,
> with intent that others rely upon the
> concealment, suppression or omission of such
> material fact *** in the conduct of any trade

-16-

1-06-0878

or commerce."  815 ILCS 505/2 (West 2004).
The Act is to be liberally construed in order to effectuate its
purpose.  Johnson, 354 Ill. App.3d at 690.

Here, the circuit court held that plaintiff failed to
establish his claim under the Act where he "was unable to
characterize [the $3 service fee] as the net fee or point to any
misrepresentation made by American Express."  The court further
determined that plaintiff failed to show damages.  We agree.

As he did in the court below, plaintiff bases his entire
argument in this court on Covarrubias v. Bancomer, 351 Ill. App.
3d 737 (2004).  In Bancomer, the plaintiff utilized the services
of the defendant monetary transfer service to send the equivalent
of $100 to a relative in Mexico for a $12 fee.  The transaction
receipt showed a $12 "Net Sale Fee" and stated that at a "Sure
Money Exchange Rate" of 9.71 pesos to the United States dollar,
the plaintiff's relative received 971 pesos.  The receipt also
had a line that provided, "Current Interbank Exchg Rate: 0."

A few months after the transaction, the plaintiff filed a
complaint in which he alleged that the defendant violated the Act
because it had paid considerably less than $100 for the 971 pesos
it provided the plaintiff's relative.  As such, he argued that
the defendant deceptively labeled the transaction as providing a
"net sale fee" of $12 when the defendant also earned a profit by

obtaining the 971 pesos it provided the plaintiff's relative for less than $100. The circuit court dismissed the plaintiff's claim based on its conclusion that the defendant was not under a duty to disclose that its 9.71 exchange rate included a profit. Bancomer, 351 Ill. App. 3d at 738-39. On appeal, however, the reviewing court reversed the circuit court and held that the plaintiff did state a cause of action under the Act. Bancomer, 351 Ill. App. 3d at 742.

Although we acknowledge the factual similarities between Bancomer and the case at bar, we find plaintiff's reliance on Bancomer to be unpersuasive. First, we observe that the Bancomer court's analysis relied heavily on Martin v. Heinold Commodities, Inc., 163 Ill. 2d 33 (1994), and Bernhauser v. Glen Ellyn Dodge, Inc., 288 Ill. App. 3d 984 (1997). We find those cases distinguishable.

In Martin, 163 Ill. 2d at 51, the plaintiff purchased commodity options contracts through the defendant, Heinold Commodities, Inc. Following a London Commodity Option (LCO) transaction, the defendant labeled a commission as a foreign service fee in its summary disclosure statement to plaintiff. The court concluded that the plaintiff was thus led to believe that the "fee" was an additional cost that the defendant incurred and paid to a third party in LCO transactions. Martin, 163 Ill.

2d at 51. Despite the defendant's protestations that the labeling complied with the Commodity Futures Trading Commission's regulations found in the Code of Federal Regulations (CFR), and thus served as a defense to a violation of the Act, our supreme court held that the defendant not only violated the CFR but affirmed the lower courts' rulings that the defendant had violated the Act. Martin, 163 Ill. 2d at 51-53. In so holding, our supreme court explained, "However, we simply note that Heinold's deception was not in failing to disclose the *exact* amount of its compensation, but in failing to disclose that the foreign service fee was a commission, from which it would derive compensation." (Emphasis in original) Martin, 163 Ill. 2d at 52.

In Bernhauser, 288 Ill. App. 3d at 986-87, plaintiffs brought separate lawsuits against defendant car dealers in which plaintiffs alleged that the respective defendants placed the fees for extended-service contracts under the heading "Amounts Paid to Others for You" in their respective retail installment contracts (RIC), and thus represented the extended-service contract fees as "pass through charges." The records showed, however, that the defendants merely paid administrative fees to third parties and pocketed the balance of the extended-service contract fee. That said, the respective circuit courts dismissed plaintiffs' claims

pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 1994)) where the courts found that the Truth in Lending Act (15 U.S.C. § 1601 et. seq. (1994)) permitted the nondisclosure of where the extended-service contract money was going. Bernhauser, 288 Ill. App. 3d at 987-88.

On appeal, however, the reviewing court reversed the circuit courts' rulings in a consolidated ruling after determining that the plaintiffs stated a *prima facie* case under the Act. Bernhauser, 288 Ill. App. 3d at 991. In so ruling, the court determined that the defendants' practice did not comply with the Truth in Lending Act and Regulation Z (12 C.F.R. § 226 (1979)). Bernhauser, 288 Ill. App. 3d at 992.

As such, the defendants in Martin and Bernhauser mislabeled fees on receipts as payments to third parties when those fees were all or in part profits retained by the defendants. Bancomer did not entail the mislabeling of a profit as a fee but, rather, involved the defendant's failure to reveal that it received a better exchange rate when it bought Mexican pesos than the plaintiff received when he transferred $100 to Mexico for the Mexican pesos his relative received. Consequently, it is questionable whether the holdings in Martin and Bernhauser provide support for the holding in Bancomer.

More significantly, we recognize the procedural differences

1-06-0878

between <u>Bancomer</u> and the case at bar. In <u>Bancomer</u>, the reviewing court reversed the circuit court's order granting the defendant's motion to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2004)). <u>Bancomer</u>, 351 Ill. App. 3d at 742. Conversely, the case at bar involves a circuit court's order granting summary judgment (735 ILCS 5/2-1005 (West 2004)) after an earlier denial of defendant's motion to dismiss. Thus, the circuit court here possessed a more developed record of the parties' transaction when making its ruling. This court also has the benefit of this developed record.

Teter's and Norton's affidavits, coupled with Teter's and plaintiff's depositions, show that upon plaintiff's entrance into defendant's office, the electronic exchange rate board displayed an exchange rate of 0.080936652 United States dollars per Mexican peso. The FSR informed plaintiff of this exchange rate and also revealed that defendant charged a $3 fee per transaction. The FSR then conducted the transaction only after plaintiff agreed to the exchange rate and service fee. Upon completion of the transaction, plaintiff received a receipt which noted the $3 transaction fee as "fees" and "total fees" and did not object.

In addition, Teter disclosed that defendant receives a better exchange rate when its Global Foreign Exchange office in England purchases currency than a customer receives on an

-21-

individual transaction due to the fact that defendant receives a wholesale rate as opposed to a customer retail rate. Teter further admitted that defendant clearly hoped to obtain additional revenue from its customer transactions.

Thus, unlike Bancomer, the record shows that defendant at bar did not represent the transaction fee as a "net sale fee" nor did it imply that the interbank exchange rate was zero. Nonetheless, despite the language used on the receipt, we find that defendant's profit-seeking behavior should have been evident to plaintiff. The Seventh Circuit recognized this economic reality in In re Mexico Money Transfer Litigation, 267 F.3d 743 (7th Cir. 2001), a case which the Bancomer court declined to follow without much explanation.

In In re Mexico Money Transfer Litigation, the plaintiffs filed a class action complaint in which they alleged that the defendants MoneyGram and Western Union failed to disclose that they generated profits in addition to the transaction fees they charged for currency transfers based on the different exchange rate they received as compared to a customer. Although the parties settled out of court, some plaintiff class members opted out of the agreement and challenged it in court. Following the district court's affirmation of the award, the objectors appealed. On appeal, the Seventh Circuit not only found the

1-06-0878

settlement adequate but commented:

"No state or federal law requires either currency exchanges or wire-transfer firms to disclose the interbank rate at which they buy specie, as opposed to the retail rate at which they sell currency (and the retail price is invariably disclosed). That is why the plaintiffs have been driven to make generic fraud claims. But since when is failure to disclose the precise difference between wholesale and retail prices for any commodity 'fraud'?" In re Mexico Money Transfer Litigation, 267 F.3d at 749.

The Seventh Circuit then stated:

"Money is just a commodity in an international market. [Citation.] Pesos are for sale-at one price for those who buy in bulk (parcels of $5 million or more) and at another, higher price for those who buy at retail and must compensate the middlemen for the expense of holding an inventory, providing retail outlets, keeping records, ensuring that the recipient is the one

designated by the sender, and so on. Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods." In re Mexico Money Transfer Litigation, 267 F.3d at 749.

We find In re Mexico Money Transfer Litigation instructive. Defendant at bar, much like a retailer in any other industry, failed to disclose to plaintiff that it purchased a commodity at a wholesale rate, which it then sold to the plaintiff at a marked-up retail rate. Despite plaintiff's protestations, we do not find that such behavior constitutes a deceptive act. To conclude otherwise would discriminate against defendant simply based on the commodity - currency - that it buys and sells. As such, we conclude that plaintiff cannot establish that defendant committed a deceptive act by labeling the $3 service fee as "total fees" on plaintiff's receipt.

Moreover, even if plaintiff presented a question of fact as to the existence of a deceptive act, we find that he failed to demonstrate that he suffered any damages. Plaintiff argues that the damages he incurred should be measured as the difference

1-06-0878

between the rate which defendant paid plaintiff for his pesos and the rate defendant received when defendant subsequently sold those same pesos.  As previously discussed, plaintiff had no access to the wholesale rate which defendant received as a result of selling the pesos in very large quantities, as explained in In re Mexico Money Transfer Litigation, 267 F.3d at 749.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

NEVILLE and MURPHY, JJ., concur.