John **TRUE** and Gonzalo **Delgado,** individually, and on behalf of all others similarly situated, Plaintiffs,

v.

**AMERICAN HONDA MOTOR COMPANY, Defendant.**

**Case No. EDCV 07–0287–VAP (OPx).**

United States District Court, C.D. California.

Feb. 26, 2010.

---

Denise Davis Schwartzman, Nicholas E. Chimicles, Chimicles & Tikellis, Haverford, PA, Jon A. Tostrud, Jonathan W. Cuneo, Matthew E. Miller, Matthew Wiener, Maxwell M. Blecher, William H. Anderson, Cuneo Gilbert and Laduca Los Angeles, CA, for Plaintiffs.

Alan Benjamin Clark, Livia M. Kiser, Mark S. Mester, Wendy Peterson Harper,

Latham & Watkins LLP, Los Angeles, CA, for Defendant.

## ORDER DENYING (WITHOUT PREJUDICE) (1)PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT and (2) PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND INCENTIVE AWARDS

VIRGINIA A. PHILLIPS, District Judge.

Plaintiffs' Motion for Final Approval of Settlement and Motion for Attorneys' Fees and Incentive Awards came before the Court for a hearing on February 22, 2010. After reviewing and considering all papers filed in support of, and in opposition to, the Motions, as well as the arguments advanced at the hearing, the Court DENIES both motions, as set forth below.

Plaintiff John True ("True") filed this lawsuit against American Honda Motor Company ("Defendant" or "AHM") on behalf of a putative class of Honda Civic Hybrid ("HCH") purchasers and lessees on March 9, 2007.[1] In the operative First Amended Complaint ("FAC"), Plaintiffs seek relief: (1) for violations of California Business and Professions Code §§ 17200, *et seq.*; (2) for violations of California Business and Professions Code §§ 17500, *et seq.*; (3) for violations of California Business and Professions Code §§ 1750, *et seq.*; and (4) under a common law theory of unjust enrichment.

Plaintiffs allege the class members were exposed to false and misleading advertising regarding the fuel economy of HCHs and relied on these representations in paying a "Hybrid premium"[2] and purchasing HCHs during the class period, between 2003 and 2008. (FAC ¶¶ 1–10; Class Action Settlement Agreement and Release ("Settlement Agreement")[3] at 1, 9.)

On August 27, 2009, the Court preliminarily certified a settlement class, preliminarily approved the initial proposed settlement, and directed notice be given to the class. On February 8, 2010, Plaintiffs filed a motion seeking final approval of a revised settlement ("the proposed settlement"), as well as a motion for the disbursement of attorneys' fees and incentive awards. AHM also submitted a brief and evidence in support of approval on February 9, 2010.[4]

Several objectors filed oppositions to the motions on February 17 and 18, 2010, as have twelve state Attorneys General as amici curiae on February 19, 2010. The Court held a fairness hearing on February 22, 2010, and heard argument from the parties, as well as objectors to the terms of the settlement.

---

1. Gonzalo Delgado was subsequently added as a representative plaintiff on November 16, 2007. True and Delgado are collectively referred to as the "representative plaintiffs" or "Plaintiffs."

2. Although in their complaint Plaintiffs estimated this premium to be $7,000, FAC ¶ 15, Plaintiffs' expert now has calculated that the premium ranged from $2,240 to $3,090. (Doc. 105 at 8–9.)

3. In their memorandum in support of their motion for final approval, Plaintiffs stated they would file a complete revised settlement agreement "in short order." (Pls.' Mem. at 1, n. 2.) They did not so until 3:22 P.M. on the

Friday before the hearing. (Doc. No. 163.) This was insufficient to give the Court, counsel, or class members time to consider the actual proposed settlement agreement at issue. Therefore, the Court cites only to the initial proposed settlement agreement and counsel's representations as to the content of the revisions.

4. Nearly all of AHM's submissions in connection with these motions have been under seal, although AHM has not obtained approval of the Court to do so pursuant to Local Rule 79–5.1. As discussed at the hearing, the Court thus orders Defendants under seal submissions stricken from the record in an accompanying minute order.

## I. BACKGROUND

### A. Procedural History

The parties engaged in approximately 11 months of discovery and motion practice before engaging in mediation. In December 2008, after several rounds of mediation, the parties informed the Court they had reached a settlement of the claims, and on March 2, 2009, Plaintiffs moved for preliminary approval of that settlement on behalf of the class. On March 25, 2009, 2009 WL 838284, the Court denied that motion with leave to submit additional materials. Upon the submission of supplemental materials and a second hearing, the Court granted the motion for preliminary approval and preliminarily certified a settlement class on August 27, 2009. The class was defined as "All persons who purchased or leased a new Honda Civic Hybrid automobile model years 2003 through 2008 in the United States of America including the District of Columbia," except certain persons affiliated with AHM, class counsel, and those who opt out of the class. (Doc. 114 at 4.)

In accordance with the Court's Order granting preliminary approval, notice was both mailed to class members and posted on a website ("the HCH Fuel Economy Website"). (Pls.' Mem. at 7–8; Lifosjoe Decl. ¶¶ 3, 6, 10; Wright Decl. ¶¶ 3–5; Cooper Decl. ¶¶ 2–4.) The website also contained other documents, including the initial proposed settlement agreement itself. (Lifosjoe Decl., Ex. D.) The Settlement Administrator, AHM, also sent the notice by electronic mail message ("e-mail") to the 55,469 class members for whom it had e-mail addresses. (Lifosjoe Decl. ¶¶ 12–14, Ex. E.) It also operated a toll-free telephone "helpline," which received 1,591 calls as of January 31, 2010. (Lifosjoe Decl. ¶ 16.)

Notice of the initial proposed settlement was also mailed to the United States Attorney General and the Attorneys General of each of the fifty states and the District of Columbia, as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b).[5] (Kiser Decl. ¶ 3, Exs. A–B.)

Both before and after the preliminary approval of the initial proposed settlement, the Court received several filings in opposition to approval of the settlement. These include formal objections from objecting class members Gaetano Paduano; Robyn Major; Francine P. Peterman; Stephen and Richard Vise ("the Vise objectors"); Joseph K. Goldberg, Valerie M. Nannery, and Katherine A. Burghardt ("the Goldberg objectors"); and the State of Texas (collectively, "the Objectors"). A coalition of twenty-five state Attorneys General and one state Office of Consumer Affairs also filed an *amicus curiae* brief in opposition to the initial proposed settlement.[6]

Several additional objections were sent directly to class counsel by unrepresented class members. These include letters from Norman Whitton, Daniel Bergmann, Keith Cyrnek, Michael Beishe, Robert Tighe, and Gerald Nicholson. (Plaintiffs' Consolidated Response to Objections to Settlement Agreement ("Pls.' Resp. to

---

**5.** CAFA only requires that notice be sent to "the appropriate State official of each State in which a class member resides and the appropriate Federal official." 28 U.S.C. § 1715(b). Here, class members resided in every state and the District of Columbia.

**6.** This brief (the "AGs Amicus Brief") was filed on behalf of the Attorneys General of Alabama, Alaska, Arizona, California, Colorado, Florida, Idaho, Illinois, Iowa, Maine, Michigan, Mississippi, Nevada, New Hampshire, New Jersey, New Mexico, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Vermont, and West Virginia, and the Georgia Governor's Office of Consumer Affairs.

Objs."), Ex. A.) In addition to these objections, several class members sent other letters expressing their views on the settlement to either class counsel or the Settlement Administrator. (*See* Pls.' Resp. to Objs., Ex. B; Opt–Out Forms & Written Communications Submitted to Settlement Admin.)

The Court has reviewed these submissions, as well as the opt-out forms submitted to the Settlement Administrator, which have been lodged with the Court.

The parties also reviewed the various communications from class members. As a result, they agreed to several adjustments and "clarifications" to the terms of the settlement, as described below. (Pls.' Mem., Ex. A.)

On February 8, 2010, Plaintiffs filed a Motion for Final Approval of Settlement and a Motion for the Approval of Attorneys' Fees and Incentive Awards. Plaintiffs seek a Final Order (1) certifying a class for settlement purposes; (2) granting approval of the proposed settlement; and (3) "granting such other and additional relief as the court may deem just and appropriate." (Mot. at 1.)

## B. Settlement Terms

The proposed settlement does not create a settlement fund. Rather, it provides for up to four kinds of relief for class members, as well as incentive payments for the two named plaintiffs and attorneys' fees for class counsel. The declarations of Plaintiffs' counsel and the third-party mediator, as well as other materials in the record, demonstrate the parties engaged in substantial and arms-length negotiations over several sessions, in person and through various electronic media.

## 1. Relief for Class Members

(a) *Fuel Economy DVD*—AHM will mail all class members a DVD, produced by AHM specifically for purposes of this settlement, "demonstrating how to operate and maintain [HCH] vehicles to maximize and optimize fuel economy." (Pls.' Mem. at 4.) The content of the DVD will also be accessible in streaming video format on the HCH Fuel Economy Website for a limited time. (*Id.*) Class members will not, however, be required to view this material before submitting a claim.[7] (Pls.' Mem. at 6, Ex. A at 3.) The DVD has yet to be finalized, and AHM is not required to produce a script or story boards for the DVD to class counsel until forty-five days *after* the settlement is given final approval. (Prop. Settlement at 14.)

(b) *Rebates*—Class members will be able to select from one of two rebate options, referred to as "Option A" and "Option B."

— "Option A" is a $1,000 cash rebate for those class members "who sell or otherwise trade in [8] their HCH *and* purchase an Eligible Honda Vehicle." (Pls.' Mem. at 4, emphasis added.) Such rebates are non-transferable, and expire twelve (12) months after the later of (1) the effective date of settlement or (2) October 31, 2011. (*Id.*)

— "Option B" is a $500 cash rebate, available to those class members "who retain their HCH *and* purchase an Eligible Honda Vehicle." (*Id.*, emphasis added.) This rebate is transferable to certain family members, and also expires twelve (12) months after the later of the effective date of settlement or October 31, 2011.[9] (*Id.*)

---

7. This represents a change from the initial proposed settlement preliminarily approved by the Court.

8. By definition, this option will not be available to lessees, who cannot sell or trade in their vehicles. (Settlement Agreement at 14.)

9. The expiration date for both rebate options

— "Eligible Honda Vehicles" are defined as any new model year 2010 or 2011 Honda or Acura vehicle.[10] (Pls.' Mem. at 7, Ex. A at 2.)

(c) *Cash*—A *subset* of class members will be eligible to receive, in addition to any rebates they receive under Option A or B,[11] a cash payment of $100 (referred to as "Option C"). (Pls.' Mem. at 7, Ex. A at 3.) This subset is defined as those class members "who made a documented [c]omplaint regarding the fuel economy of their HCH to (1) AHM or an authorized Honda or Acura dealership who reported the [c]omplaint to AHM; or (2) to Class Counsel," before March 2, 2009. (*Id.;* Prop. Settlement at 3–4.) Class members will only be eligible for the Option C cash payment if there is a "written record [of their complaint] which was created in the ordinary course of business." (Prop. Settlement at 3–4.)

(d) *Injunctive Relief*

AHM will "promptly undertake to review all of its fuel economy advertising for the HCH" and "modify its disclaimer language, including, at a minimum, changing language from 'actual mileage may vary' to 'actual mileage will vary.'" (Pls.' Mem. at 5.) The modified language will be in use for "a period of no fewer than twenty-four (24) months from the Effective Date [of settlement]." (*Id.*)

**2. Release of Claims**

In exchange for the relief described above, under the proposed settlement, class members who do not opt out will be barred from:

filing, commencing, prosecuting, intervening in, or participating ... in any other lawsuit or administrative, regulatory, arbitration or other proceeding in any jurisdiction based on, relating to or arising out of the claims and causes of action or the facts and circumstances giving rise to this Lawsuit or the Released Claims.

(Settlement Agreement at 28.) These class members will also be barred from organizing members of the class who did not opt out into a separate class for purposes of pursuing another class action "relating to and/or arising out of the claims and causes of action or the facts and circumstances giving rise to this Lawsuit or the Released Claims." (*Id.*) The "Released Claims" are those "relating to, arising out of or in any way connected with, directly or indirectly, the advertising of the fuel economy or m.p.g. of the HCH, AHM's representations concerning the fuel economy or m.p.g. of the HCH and any claims that were, could have been or should have been brought in the Lawsuit by the Named Plaintiffs and/or the Settlement Class." (Settlement Agreement at 7–8.) The release specifically excludes claims related to the manufacturer's limited warranty except those related to "advertising or representations made by AHM with respect to fuel economy, mileage, or m.p.g." (*Id.* at 8.)

In revising the proposed settlement, the parties have added language clarifying that the release will not preclude class members "from participating in regulatory actions (if any) initiated by a state or

has been extended from that in the initial proposed settlement preliminarily approved by the Court.

**10.** This represents a change from the initial proposed settlement preliminarily approved by the Court.

**11.** This represents a change from the initial proposed settlement preliminarily approved by the Court.

federal agency." (Pls.' Mem. at 5–6, Ex. A at 2.)

### 3. Incentive Payments and Attorneys' Fees and Costs

Plaintiffs seek approval of incentive payments of $12,500 for Plaintiff True and $10,000 for Plaintiff Delgado. (Pls.' Mem. in Supp. of Mot. for Attorneys' Fees at 9.) Plaintiffs' counsel seek an award of attorneys' fees in the amount of $2,950,000, and AHM does not oppose such an award. (*Id.* at 1.)

### C. Settlement Administration

All class members automatically will be mailed the DVD. (Pls.' Mem. at 4, 9.) To receive either rebates under Options A or B, or a cash payment under Option C, class members will be required to log onto the HCH Fuel Economy Website, enter their vehicle identification number ("VIN"), and download and submit a claim form within 60 days of the date the Fuel Economy Video is posted on the HCH website.

## II. LEGAL STANDARD

■ Where "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir.2003).

### A. Class Certification

Under Rule 23(a), in order to bring a class action, a plaintiff must demonstrate: the class is so numerous that joinder of all members is impracticable ["numerosity"], (2) there are questions of law or fact common to the class ["commonality"], (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"], and (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy of representation"].

In addition to these prerequisites, a plaintiff must satisfy one of the prongs of Rule 23(b) in order to maintain a class action. Where, as here, a plaintiff moves for class certification under Rule 23(b)(3), the plaintiff must prove that:

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The matters pertinent to the findings include: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; and (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum.[12] Fed. R.Civ.P. 23(b)(3).

### B. Fairness of the Settlement

■ Before approving a settlement, the court must hold a hearing and find that "the settlement ... is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(1)(C). Review of a proposed settlement generally proceeds in two stages, a hearing on preliminary approval followed by a final fairness hearing. *See* Federal Judicial Center, *Manual for Complex Litigation,* § 21.632 (4th ed.2004).

---

**12.** A fourth factor, "the difficulties likely to be encountered in the management of a class action," need not be considered when class certification is only for settlement purposes.

Fed.R.Civ.P. 23(b)(3)(D); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ At the preliminary approval stage, a court determines whether a proposed settlement is "within the range of possible approval" and whether or not notice should be sent to class members. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 205 (5th Cir.1981); *see also Manual for Complex Litigation* § 21.632. At the final approval stage, the Court takes a closer look at the proposed settlement, taking into consideration objections and any other further developments in order to make a final fairness determination.

■ In determining whether a settlement is fair, reasonable, and adequate, a court is to balance several factors, including:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir.1992), *citing Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.1982); *see also In re Heritage Bond Litig.*, 546 F.3d 667, 674 (9th Cir.2008). This is "by no means an exhaustive list of relevant considerations," though, and "[t]he relative degree of importance to be attached to any particular factor will depend on the unique circumstances of each case." *Officers for Justice*, 688 F.2d at 625.

■■ In evaluating a proposed settlement, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.1998). The Court "does not have the ability to delete, modify, or substitute certain provisions," and "[t]he settlement must stand or fall in its entirety." *Id.* The question is not whether the settlement "could be prettier, smarter, or snazzier," but solely "whether it is fair, adequate, and free from collusion." *Id.*, 150 F.3d at 1027.

## III. DISCUSSION

### A. Certification of the Class

Before examining the fairness of the proposed settlement, the Court examines the suitability of certification of the settlement class.

#### 1. Numerosity

■ To establish, under Rule 23(a)(1), that joinder of all members is "impracticable," the plaintiff need not show that it would be "impossible" to join every class member. *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D.Cal.1996). There is no specific number requirement, as the court may examine the specific facts of each case. *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 594 (E.D.Cal. 1999).

■ Here, Plaintiffs' counsel estimates the proposed class consists of 176,990 persons nationwide. (Pls.' Mem. at 1, n. 1, 19.) This satisfies the numerosity requirement of Rule 23(a).

#### 2. Commonality

■ "[T]he commonality requirement is interpreted to require very little." *In re Paxil Litig.*, 212 F.R.D. 539, 549 (C.D.Cal. 2003). As the Ninth Circuit has explained:

> All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

*Hanlon,* 150 F.3d at 1019. Thus, "[f]or the commonality requirement to be met, there must only be one single issue common to the proposed class." *Haley,* 169 F.R.D. at 648.

■ Here, the FAC alleges several common questions of fact and law: (1) whether Defendant's advertising was false and misleading; (2) whether Defendant's claims about fuel economy were material to class members' decision to purchase HCH vehicles; (3) whether the class members suffered damages as a result of Defendant's conduct; (4) whether Defendant knew or should have known its advertising was false or misleading; (5) whether Defendant knew or should have known the class members would experience significantly less fuel economy than advertised; and (6) whether Defendant concealed or failed to tell class members about material facts regarding fuel economy. (Mot. at 19–20; FAC ¶¶ 26–32.)

Due to these common questions, the class satisfies the commonality requirement.

### 3. Typicality

■ To gauge typicality, a "court does not need to find that the claims of the purported class representative[s] are identical to the claims of the other class members." *Haley,* 169 F.R.D. at 649. Rather, "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members." *Hanlon,* 150 F.3d at 1020. Additionally, the class representatives "must be able to pursue [their] claims under the same legal or remedial theories as the unrepresented class members." *Paxil,* 212 F.R.D. at 549.

■ The representative plaintiffs' claims are typical of the settlement class members in that they arise from the same alleged course of events: (1) AHM's misrepresentations regarding the fuel economy of the HCH; (2) customers' reliance on these misrepresentations when purchasing or leasing HCHs; and (3) the HCH's failure to achieve the advertised fuel economy. Both representative plaintiffs have declared that they relied on the alleged misrepresentations in purchasing their HCHs, and that their vehicles did not achieve the advertised fuel economy. (Pls.' Mem. at 20; True Supp. Decl. ¶¶ 5–8; Delgado Supp. Decl. ¶¶ 6, 9, 12.)

The only relevant objection to a finding of typicality comes from the Vise Objectors. They contend that certification is inappropriate because "the class is composed of people with vastly different claims."[13] (Vise Obj. at 3.) They assert the existence of two purported differences: (1) the class includes both lessees and purchasers of HCH vehicles; and (2) "the advertised mileage changed each year." (*Id.*) The Court finds neither of these differences defeat typicality. Multiple courts have certified classes involving the claims of both purchasers and lessees of vehicles. *See, e.g., Daffin v. Ford Motor Co.,* 458 F.3d 549, 552 (6th Cir.2006); *Parkinson,* 258 F.R.D. at 594; *Trew v. Volvo Cars of N. America, LLC,* No. Civ. S–05–1379 RRB, 2007 WL 2239210, at *2 (E.D.Cal. July 31, 2007). As to any differences in the gas mileage advertised and obtained on different model year HCH vehicles, such minor differences do not defeat typicality. In false advertising-related claims in particular, courts have regularly certified classes involving "some factual varia-

---

13. The Vise Objectors refer to this as an issue of the adequacy of representation by the named plaintiffs, but the Court finds the objection is directed more at typicality. *See* *Parkinson v. Hyundai Motor America,* 258 F.R.D. 580, 590 (C.D.Cal.2008) (noting overlapping nature of commonality, typicality, and adequacy inquiries).

tions" among the advertising viewed. *Tylka v. Gerber Products Co.*, 178 F.R.D. 493, 497 (N.D.Ill.1998), *citing Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992). *See also Greenwood v. Compucredit Corp.,* No. C 08–04878 CW, 2010 WL 291842, at *4 (N.D.Cal. Jan. 19, 2010); *Menagerie Productions v. Citysearch,* No. CV 08–4263 CAS, 2009 WL 3770668, at *7 (C.D.Cal. Nov. 9, 2009).

Neither of the purported differences change the fact that class members' injuries are similar and result from the same injurious course of conduct. *See Armstrong v. Davis,* 275 F.3d 849, 869 (9th Cir.2001). The Court thus finds the typicality requirement is met here.

### 4. Adequacy of Representation

▇▇▇ Traditionally, courts have engaged in a two-part analysis to determine if a plaintiff has met the requirements of Rule 23(a) (4): (1) the class representative must not have interests antagonistic to the unnamed class members, and (2) the representative must be able to prosecute the action "vigorously through qualified counsel." *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978).

▇▇▇ Adequate representation "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Paxil,* 212 F.R.D. at 550. Courts determine the adequacy of counsel using the factors specified by Fed. R. Civ. Pro. 23(g). *See, e.g., Hill v. Merrill Gardens, LLC,* No. 1:04CV–248, 2005 WL 2465250, at *3 (N.D.Ind. Oct. 6, 2005); Fed. R. Civ. Pro. 23 Advisory Committee Notes.

### a. Named Plaintiffs

▇▇▇ Both Plaintiffs True and Delgado have been sufficiently involved with the litigation as it has progressed, participating in discovery and settlement negotiations. (True Supp. Decl. ¶¶ 12–22, 25; Delgado Supp. Decl. ¶¶ 12–26, 30.) The Court nonetheless has misgivings about their adequacy as representatives, due to their membership in the limited group of class members who are eligible to receive cash payments of $100 under Option C, and the potential conflict this creates.[14] *Compare Clement v. Am. Honda Fin. Corp.,* 176 F.R.D. 15, 22 (D.Conn.1997) (declining to certify settlement class on adequacy grounds where "the named plaintiffs each secured a $2500 cash payment for themselves and a $140,000 attorney fee award for their attorneys, [and] the individual class members were to receive ... a worthless coupon and deficiency credit"). "To represent adequately a class, class representatives' interests must align with all putative class members' interests...." *Andrews Farms v. Calcot, Ltd.,* No. CV–F–07–0464 LJO, 2009 WL 1211374, at *11 (E.D.Cal. May 1, 2009), but the proposed settlement here seems to create a conflict between the representative plaintiffs and those class members not eligible for Option C. *See also Amchem,* 521 U.S. at 627, 117 S.Ct. 2231; *Hanlon,* 150 F.3d at 1021; *Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1190 (9th Cir.2001). The Court need not resolve this concern as to adequacy, though, because it finds the additional relief for certain class members provided by Option C, among other aspects of the proposed settlement, makes the settlement substantively unfair, as discussed in greater detail below.

---

**14.** There is an additional concern based on weaknesses in the representative plaintiffs' cases, discussed further below.

## b. Counsel

██ In connection with their motion for preliminary approval, Plaintiffs submitted substantial evidence of class counsel's experience with class action, complex, and other large-scale litigation, including substantial trial experience. Neither objectors nor amici have made any challenge to Plaintiffs' counsel's qualifications. Based on the evidence submitted in connection with the motion for preliminary approval, and its own observation of their work throughout the case, the Court concludes Plaintiffs' counsel have made an adequate showing of their qualifications. *See* Fed. R.Civ.P. 23(g).

## 5. Predominance of Common Questions of Law or Fact and Superiority of a Class Action

██ Plaintiffs satisfy the requirements of Rule 23(b). Common questions of fact predominate, common questions of law predominate, and a class action is the superior way to resolve this controversy.

First, this action concerns claims based on nationwide advertising created and distributed on behalf of a single company regarding a single product; all class members allegedly wrongly paid a "hybrid premium," or additional cost to obtain a hybrid rather than conventional vehicle. The Court already has determined it can infer that plaintiffs relied on the advertising because the alleged misrepresentations were material. (Pls.' Mem. at 23; June 22, 2007, 520 F.Supp.2d 1175 (C.D.Cal.2007), Order Denying Defendant's Mot. to Dismiss at 12–13.) Although individual damages, including restitution for unanticipated fuel expenses, would vary, common issues of fact predominate over individualized inquiries. (*See* Pls.' Mem. at 23.)

Second, common legal issues predominate because Plaintiffs assert that uniform law, namely that of California, applies to the claims of all members of the nation-

wide class because: (1) AHM's headquarters are in California; (2) AHM's primary advertising agency, RPA, is in California; (3) "RPA created and placed all or substantially all of the advertising and promotional materials at issue in this Lawsuit for AHM from its offices in California"; (4) "AHM and RPA coordinated Honda's national and regional advertising, and AHM regulated or reviewed dealer advertising from its headquarters in Southern California"; (5) AHM's advertisements were reviewed by its legal and regulatory employees in California; and (6) substantially more HCHs were sold in California than in any other single state. (Pls.' Mem. at 22; *citing Clothesrigger, Inc. v. GTE Corp.*, 191 Cal.App.3d 605, 613, 236 Cal. Rptr. 605 (1987); *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224, 242, 110 Cal.Rptr.2d 145 (2001).)

These elements establish that a "common nucleus of facts and potential legal remedies dominates this litigation." *Hanlon*, 150 F.3d at 1022. Plaintiffs also have shown that a class action is a superior method of resolving this controversy, as each class member has a relatively small and uniform injury, and the costs of litigation would make individual cases impracticable.

## B. Fairness and Adequacy of Settlement Agreement

██ The Court now turns to the terms of the proposed settlement to ascertain whether the settlement is fair, adequate and reasonable. In addition to the standard factors noted above, the Court notes two aspects of this proposed settlement that warrant special attention.

## 1. Differences in Remedies Available to Certain Class Members

As noted above, the proposed settlement's award of a cash payment—"Option C"—to only a select sub-group of the class creates the most significant obstacle to

approval of this settlement.[15] This subgroup is defined as those who filed complaints with AHM, those who filed complaints with a Honda dealer who then passed the complaint along to AHM, or those who complained to class counsel prior to March 2009.[16] The members of this subgroup are the *only* class members who will receive a true cash award in this settlement. Plaintiffs contend that an extra award for members of this sub-group is appropriate, as these class members were "aggrieved enough to have taken steps towards litigation in complaining to AHM." (*See, e.g.*, Pls.' Resp. to Objs. at 14.) Of note, both of the representative plaintiffs are members of the subclass.

■ Courts generally are wary of settlement agreements where some class members are treated differently than others. *See, e.g., In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.* (*"In re GMC Pick–Up Litig."*), 55 F.3d 768, 808 (3rd Cir.1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others."). *Compare Hanlon,* 150 F.3d at 1021 (rejecting objection to settlement where settlement "does not propose different terms for different class members"). While differential treatment of class members may be appropriate where "the settlement terms are rationally based on legitimate considerations," this does not appear to be the case here. *In re*

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y.1997), *quoting In re "Agent Orange" Product Liability Litig.*, 611 F.Supp. 1396, 1411 (E.D.N.Y. 1985). *See also In re Portal Software Inc., Securities Litig.*, No. C–03–5138 VRW, 2007 WL 4171201, at *6 (N.D.Cal. Nov. 26, 2007) (approving distribution of "settlement proceeds according to the relative strengths and weaknesses of the various claims"); *Petruzzi's, Inc. v. Darling–Delaware Co., Inc.*, 880 F.Supp. 292, 300–01 (M.D.Pa.1995) ("[W]hile disparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages ... no such demonstration has been made here.").

Plaintiffs do not suggest that those in the "Option C" sub-group have any different legal claims than the other class members, or that they suffered any greater damages. They only argue that these class members should get greater relief because, simply put, they were moved to complain.[17] But Plaintiffs cite no authority that suggests that this is a "legitimate" reason to depart from the presumption that class members receive relief "based on the type and extent of their damages." *In re Enron Corp. Securities, Derivative & ERISA Litig.*, No. MDL–1446, 2008 WL 4178151, at *2 (S.D.Tex. Sept. 8, 2008), *citing In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D.Pa. 2000).[18]

---

**15.** The Court's concern is the same whether those class members who are eligible for Option C are also eligible for a rebate under Option A or B or not.

**16.** The parties and amici suggest this group constitutes only 1.6% of the Class, or 2,671 individuals. (Pls.' Mem. Ex. A; Amicus Br. of the Atty. Gen. of Cal., et al. ("AGs Amicus Br.") at 6.)

**17.** Defendant contends that Option C is restricted to "persons who made a complaint earlier." (Def.'s Sub. at 16, n. 9.) As ex-

plained below, this is an inaccurate definition of the Option C sub-group, as only an arbitrary selection of those class members who complained are included.

**18.** The one case cited by Defendant on this issue, *Anderson v. The Bakery & Confectionery Union,* 654 F.Supp.2d 267 (E.D.Pa.2009), *cited at* Def.'s Sub. at 16 n. 9, does not provide any support for its position. There, the Court discussed a settlement fund that was disbursed "based upon the relative lengths of time during which [the Eligible Claimants]

Even if a class member's ability and motivation to complain—and good fortune in selecting the correct target of the complaint—were a proper basis for greater recovery, the definition used by the parties here captures that proposed distinction poorly. A class member will be eligible for Option C only if AHM "has a written record which was created in the ordinary course of business" of his or her complaint to AHM or a Honda dealer. (Settlement Agreement at 2–3.) But whether AHM retained a written record of a complaint, or whether a Honda dealer passed along a complaint to AHM, was not within a class member's control. As noted by objector the State of Texas, this feature would thus "reward Honda to the extent that Honda failed to create or maintain records of consumer complaints." (Texas Obj. at 4.) It is not readily apparent why a complaint to AHM would indicate a class member's aggrieved status better than a complaint to the dealer from whom he or she purchased the car, or a state regulatory agency. Notably, neither representative plaintiff Delgado, nor the plaintiff in a California state court lawsuit containing similar allegations (Objector Gaetano Paduano), appear to have filed a qualifying complaint with AHM.[19]

The specific inclusion of class members who made complaints to class counsel in the Option C sub-group makes the Court even more skeptical of the sub-group's appropriateness. The only class members who benefit from the addition of this inclu-

sion appear to be the named representatives themselves. Those class members who complained to class counsel did not suffer any different injuries, do not have different legal claims, and are no more "aggrieved" than those class members who contacted other attorneys or no attorneys at all. Inasmuch as the parties seek to "reward" those class members who brought attention to the problem with HCHs, the proper reward lies in incentive payments, and only "named plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977.

The distinction in relief available to different class members in the proposed settlement is similar to that offered in the proposed settlement rejected by the court in *Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D.Cal.2007). There, the court considered a settlement that provided "economic relief" only to a subclass, differentiated from other class members solely based on the dates on which they obtained bankruptcy discharge orders. 243 F.R.D. at 387. In rejecting the proposed settlement, the court noted that the dates used to divide the class were "arbitrary and b[ore] no relationship to the procedural or substantive limitations on the class members' claims." *Id.* The court also found the "arbitrary structural division of class members" was "compounded" by the fact that the class members outside

---

worked for [Nabisco] at any time between November 17, 1971 and the date of [the Karan Settlement Agreement]." 654 F.Supp.2d at 271 (alterations in original). Tying relief in an employment-related settlement to length of time worked is clearly a legitimate rationale entirely different from the distinctions drawn here.

**19.** Representative plaintiff True complained to his local dealer and placed a telephone call to Honda's customer service department.

(True Supp. Decl. ¶¶ 8–9.) Named Plaintiff Delgado only complained to his local dealer. (True Supp. Decl. ¶ 10.) Named Plaintiff True has explicitly stated that he intends to take advantage of Option C. (True Supp. Decl. ¶ 23.) Named Plaintiff Delgado has indicated only that he finds Option A "attractive," (Delgado Supp. Decl. ¶ 27), but his declaration was executed at the time when class members could not take advantage of Option C in addition to Options A or B. There is no representative plaintiff who is ineligible for Option C.

the subclass would receive no economic relief at all. *Id.* at 387–88.

■ As in *Acosta*, the settlement here draws an arbitrary distinction among class members with identical legal claims and injuries, and allows some to receive a cash award, and others only a DVD and limited rebate. This is patently unfair, and counsels against approval of the proposed settlement.

## 2. The Proposed Settlement as a "Coupon Settlement"

■ The primary relief offered by this settlement is the $500 or $1000 rebate given to class members who purchase another Honda or Acura over the next nineteen months. Thus, the settlement is largely a "coupon settlement."[20] *See Fleury v. Richemont North America, Inc.*, No. C–05–4525 EMC, 2008 WL 3287154, at *2 (N.D.Cal. Aug. 6, 2008) (a coupon settlement is one where the relief constitutes "a discount on another product or service offered by the defendant in the lawsuit"). CAFA includes a specific requirement that a district court only approve such settlements "after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties." 28 U.S.C. § 1712(e).

Although the "fair, reasonable, and adequate" language used in section 1712(e) is identical to the language relating to settlement approval contained in Fed. R. Civ. Pro. 23(e)(2), several courts have interpreted section 1712(e) as imposing a heightened level of scrutiny in reviewing such

settlements. *See, e.g., Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir.2006); *Figueroa*, 517 F.Supp.2d at 1321. *See also* S.Rep. No. 109–14, at 27 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 27 (Section 5 of CAFA "requires greater scrutiny of coupon settlements"); Fed. R. Civ. Pro. 23(h), 2003 Advisory Committee Notes ("Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class.").

The Court acknowledges the wide range of judicial and scholarly criticism of coupon settlements cited by the Objectors and amici, and concurs that such settlements are generally disfavored. This is due to three common problems with coupon settlements: "they often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation." *Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1302 (S.D.Fla.2007), *citing* Christopher R. Leslie, "The Need to Study Coupon Settlements in Class Action Litigation," 18 Geo. J. Legal Ethics 1395, 1396–97. *See also Synfuel Techs.*, 463 F.3d at 654; *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir.2001); *In re GMC Pick–Up Litig.*, 55 F.3d at 807–10 (3d Cir.1995); *Kearns v. Ford Motor Co.*, No. CV 05–5644 GAF, 2005 WL 3967998, at *1 n. 1 (C.D.Cal. Nov. 21, 2005).

This does not mean that a coupon settlement can never be approved as fair, adequate, and reasonable, though. For example, in *In re Mexico Money Transfer Litigation*, 267 F.3d at 748–49, the Seventh Circuit affirmed the approval of a

---

**20.** Plaintiffs argue that the proposed settlement is not truly a coupon settlement, since other relief, namely the DVD, is involved. (Pls.' Resp. to Objs. at 9.) The Court finds this argument unpersuasive.

coupon settlement, even though it found the relief offered was "more in the nature of a PR gesture ... than an exchange of money (or coupons) for the release of valuable legal rights," because the underlying "claims had only nuisance value." The noncash relief offered in each coupon settlement is of different value, as are the claims upon which the settlement is based. A court's inquiry does not therefore end with a determination that a proposed settlement is a coupon settlement; it must discern if the value of a specific coupon settlement is reasonable in relation to the value of the claims surrendered.

### 3. The Strength of Plaintiffs' Case

Plaintiffs contend they "would face significant risks in continuing to litigate this case." (Pls.' Mem. at 11.) AHM contends that the case is "relatively weak on the merits and poses significant manageability problems." (Def.'s Sub. at 22.) The Objectors and amici disagree with these characterizations. *See, e.g.,* AGs Amicus Br. at 22; Goldberg Obj. at 18. The Court thus examines each of the purported weaknesses.

### (a) The Substance of Plaintiffs' Claims

The parties address several potential issues with Plaintiffs' claims that, they contend, show the weakness of the case.

### (1) Representative Plaintiffs' Testimony and Claims

AHM identifies weaknesses in the claims of the two representative plaintiffs.

There are two mileage gauges in each HCH. One shows the current fuel economy rate, and the other shows an "average" fuel economy rate, based on the average fuel economy over the period since that gauge was last reset. In his deposition testimony, representative plaintiff True conceded that he "hardly ever" reset the average mileage gauge in his HCH, and did not understand what that gauge actually showed. (True Dep. at 31:20–33:23.)

Therefore, his conclusions that his efforts to improve his mileage were having no effect may have been in error, calling into question the underlying factual basis of his claim.

AHM also suggests that representative plaintiff Delgado did not properly "understand the features of his vehicle." (Def.'s Sub. at 11.) For example, at his deposition, Delgado did not know what weight oil is recommended for use in the HCH, what factors influenced the activation of the vehicle's "auto stop" function, or that use of the cruise control function increased fuel usage. (Delgado Dep. 147:17–21; 173:24–174:10; 178:5–11.) Much of Delgado's lack of understanding derives from the theft of his owner's manual four days after his purchase of the HCH. (Delgado Dep. 149:15–150:9.) Delgado's lack of familiarity with the fuel-saving features of the HCH weakens Delgado's case.

These problems with True's and Delgado's claims counsel both in favor of and against approval. Inasmuch as they show the weakness of Plaintiffs' claims, they weigh in favor of approval. The weaknesses are specific to *these* plaintiffs, however. Other class members may well have better understood how the various features of the car worked, and nothing in True's or Delgado's testimony relates to Honda's knowledge as to the accuracy of its representations regarding fuel economy. The situation is thus different from one where there are weaknesses in the legal theory underlying an entire class's claims. Accordingly, the problems with True's and Delgado's claims raise concerns about their adequacy as representative plaintiffs, and call the certification of a settlement class into question.

In *Robinson v. Sheriff of Cook County,* 167 F.3d 1155 (7th Cir.1999), *cert. denied,* 528 U.S. 824, 120 S.Ct. 71, 145 L.Ed.2d 60 (1999), the Seventh Circuit explained the difference between these kind of weak-

nesses and their implications for class actions. The court there explained that "one whose own claim is a loser from the start" should be deemed an inadequate representative, as he "knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation." 167 F.3d at 1157. If a representative plaintiff's "claim is a clear loser at the time he asks to be made class representative, then approving him as class representative can only hurt the class." 167 F.3d at 1158. *See also O'Neal v. Wackenhut Servs., Inc.,* No. 3:03–CV–397, 2006 WL 1469348, at *20 (E.D.Tenn. May 25, 2006) (denying class certification where "the claims of the two representative plaintiffs may be significantly weaker than claims of many potential class members"). This differs from the situation where a "class representative's claim is both weak and typical—if the case as a whole is as weak as the representative's individual claim—then the case should be dismissed, with or without class certification." *Robinson,* 167 F.3d at 1157.

Developments in a California state court lawsuit alleging substantially similar claims suggest it may be the claims of the representative plaintiffs, not the claims of the entire class, that are weak. In *Paduano v. American Honda Motor Company, Inc.,* 169 Cal.App.4th 1453, 1470–1473, 88 Cal.Rptr.3d 90 (2009), the California Court of Appeal reversed a grant of summary judgment to AHM, holding that an HCH owner had presented a sufficient question of fact for his UCL and CLRA claims based on the false or misleading nature of AHM's fuel economy representations to go to trial. *Paduano* has now been settled, and AHM has agreed to pay Gaetano Paduano $50,000 to settle his claims, in addition to a minimum of $50,000 for his attorney's fees. *See* Goldberg Objs. Resp. to Pls.' Mot., Ex. 1 (Settlement Agreement, *Paduano v. Am. Honda Motor Co.,* San Diego Super. Ct. Case No. GIC 852441).

This suggests the claims of the class members may have significant value.

### (2) Preemption

AHM suggests that Plaintiffs' claims are preempted by federal law. (Def.'s Sub. at 23.) The Court already denied AHM's motion to dismiss this action on this basis. (*See* Doc. No. 23.) Without addressing the merits of this argument any further, the Court notes that this very argument was made in the California Court of Appeal, and rejected. *Paduano,* 169 Cal.App.4th at 1474–1485, 88 Cal.Rptr.3d 90. The situation is thus readily distinguished from that before this Court in *Wilson v. Airborne, Inc.,* No. EDCV 07–770–VAP, 2008 WL 3854963 (C.D.Cal. Aug. 13, 2008), cited by Defendant. (Def.'s Sub. at 23.) Although the *Paduano* court's holding is not binding on this Court, combined with this Court's earlier holding, it suggests that preemption does not pose a great obstacle to Plaintiffs' claims.

### (3) Application of California Law

AHM points out that should this case proceed, it would contest Plaintiffs' attempt to apply California law to a nationwide class. (Def.'s Sub. at 24.) Whether California law can be applied to a nationwide class is a case-specific determination, and the Court cannot determine how this issue affects the merits of Plaintiffs' claims based on the limited information and briefing before the Court. *See, e.g., Menagerie Productions v. Citysearch,* No. CV 08–4263 CAS, 2009 WL 3770668, at *15 (C.D.Cal. Nov. 9, 2009) (finding California UCL could be applied to nationwide class based on specifics of case); *Mazza v. Am. Honda Motor Co.,* 254 F.R.D. 610 (C.D.Cal.2008) (finding UCL and CLRA could be applied to nationwide class).

### (4) The Ability to Prove Allegations Regarding Misleading Nature of and Reliance Upon Advertising

AHM notes that Plaintiffs will have to prove that the advertising for the HCH

was inherently false and misleading, and that all class members reasonably relied on misleading advertising in purchasing their vehicles. (Def.'s Sub. at 24–25.) While these are both contested issues, there is evidence to support Plaintiffs' claims. In addition, Plaintiff's case is bolstered by the California Supreme Court's recent decision in *In re Tobacco II Cases,* 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009). There, the California Supreme Court suggested that only the class representative, not all unnamed class members, has to show reliance on the alleged misrepresentation, and that reliance can be inferred or presumed wherever there is a showing that a misrepresentation was material.

Plaintiffs acknowledge that this decision "provides support to Plaintiffs' allegations, particularly Plaintiff's [sic] allegations of reliance on exposure to AHM's long-term ad campaigns." (Pls.' Mem. at 12, n. 6.) They suggest, however, that "uncertainty remains" as "Defendant is likely to challenge the significance and applicability of the Tobacco II cases to the present facts." (*Id.*) AHM does not address this case in its submission to the Court.

### (5) The Satisfaction of Class Members

AHM also contends that the general satisfaction of class members with their HCHs and Honda is relevant to the strength of the Plaintiffs' claims on the merits. (Def.'s Sub. at 1–8.) This argument is overreaching. The general satisfaction of class members is irrelevant to the merits of Plaintiffs' claims, as general satisfaction is not mutually exclusive with any of the elements of the particular claims here relating to Honda's fuel economy representations.

The satisfaction of HCH owners and lessees as to the fuel economy of their HCHs is relevant, though. This is not because the owners are happy with their cars, but because these class members have made statements which directly contradict Plaintiffs' claims. In particular, many of these class members have included information about the fuel economy they have obtained from their HCHs, suggesting that Honda's representations were not misleading as to the fuel economy of the HCH. *See, e.g.,* Opt–Out Nos. 14 (average of 48 m.p.g.); 89 (average of 48–49 m.p.g.); 155 (average of 52–53 m.p.g.); 189 ("better than advertised mileage"); 213 (average of 45–50 m.p.g.); 315 ("48 mpg in town and up to 60 mpg on the highway"). In this respect, the experience of other class members does weaken Plaintiffs' claims, though it is not necessarily fatal.

AHM also argues that the varied experiences of class members in terms of the fuel economy they obtained will present significant manageability problems, and would make it difficult for plaintiffs to maintain class status throughout trial. (Def.'s Sub. at 19.) This concern is likely overstated, as whether the representations made by Honda about the HCH were knowingly or intentionally misleading will not depend on the individual fuel economy achieved by each class member, but about the HCH's fuel economy in general. For this reason, AHM's arguments that the various factors that influenced the mileage an individual class member achieved would make class action inappropriate are also unavailing. (Def.'s Sub. at 21–22.)

### (b) Possible Issues Regarding Class Status

Beyond the substance of the claims and the differences in fuel economy achieved by class members, the parties raise several other issues related to the ability of plaintiffs to maintain class status throughout trial.

Plaintiffs note that, should they proceed with their case, "AHM would vigorously

contest class certification." (Pls.' Mem. at 12.) Specifically, they suggest AHM would argue that certification "would present case management problems, including, *inter alia*, the possible applicability of the conflicting laws of multiple states to the claims of the class."[21] (Pls.' Mem. at 12.) They also note the inherent risks, costs, and complexity, associated with an interlocutory appeal of any decision of this Court as to class certification. (*Id.* at 12–13.)

■■■ The Court acknowledges that there remain many unsettled questions related to Plaintiffs' claims and their ability to proceed as a class that decrease their claims' value. The Court also acknowledges that there are specific weaknesses in the cases of the representative plaintiffs. The Court cannot, however, conclude that the claims are of negligible value. Even if Plaintiffs would face substantial obstacles in order to prevail, "colorable legal claims are not worthless merely because they may not prevail at trial. A colorable claim may have considerable settlement value (and not merely nuisance settlement value) because the defendant may no more want to assume a nontrivial risk of losing than the plaintiff does." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 783 (7th Cir.2004).

### 4. The Amount Offered in Settlement

Plaintiffs contend that the settlement is valued at between $23,610,649 and $45,893,083, (Pls.' Mem. at 13), a figure vigorously disputed by the Objectors and amici. This figure is based on valuations of each of the component measures of the proposed settlement. The Court thus examines each component in turn.

### (a) The Coupons and Cash Rebate

■■■ In ascertaining the fairness of a coupon settlement, the Court is to "consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement." S.Rep. No. 109–14, at 31, *as reprinted in* 2005 U.S.C.C.A.N. 3, 31. Plaintiffs rely on Professor Xavier Drèze[22] to provide an expert opinion as to these factors, leading to an estimated value of $16,183,172 for the rebates and cash payments. (Drèze Decl. ¶ 8.)

As several objectors and amici note, there are problems with both Drèze's calculations and Plaintiffs' reliance on them. As a preliminary matter, even if they were accurate as to the initial proposed settlement, Drèze's calculations are now inaccurate in light of the subsequent revisions to the settlement. Drèze's calculations were also based on several assumptions flawed as a matter of logic or law.

In determining how many class members were likely to take advantage of Options A and B,[23] Drèze appears to have conducted a three-step analysis.[24] First,

---

21. The Court notes, though, that "if the class members' claims differed so much as to preclude certification even of geographic subclasses, a settlement that treats all class members alike cannot be adequate and fair to all of them." *In re GMC Pick–Up Litig.*, 55 F.3d at 818.

22. Professor Drèze was affiliated with the Wharton School of the University of Pennsylvania at the time of his analysis, and is now an Associate Professor of Marketing at the Anderson School of Management of the Uni-

versity of California, Los Angeles. *See* Pls.' Mem. at 13; Xavier Drèze, Faculty Profile, http://www.anderson.ucla.edu/x24096.xml.

23. For Option C, Drèze discerned that 25% of those eligible for the Option (the "complainers") would submit a claim. (Drèze Decl., Att. 2.) There is no indication how Drèze reached this conclusion.

24. Although Drèze did not explain his calculations, and merely submitted a few pages of

he calculated how many class members will be likely to trade in or sell their HCH vehicle in 2010–2011. (Goldberg Obj., Ditlow Decl. ¶ 11.) Second, from this group, he calculated how many class members will likely purchase another Honda. (*Id.*) Third, from this group, he analyzed which of these class members will likely redeem the rebate for which they are eligible.

To discern what proportion of the class would fall into the first two categories, Drèze appears to have considered Honda owners' loyalty, Honda's market share, and the general frequency with which Americans replace their automobiles. (Drèze Decl. ¶ 7.) There are two flaws with this analysis.

First, Drèze's calculations were based on a premise that class members would have 24 months in which they could redeem rebates. (*Id.*) The proposed settlement provides that customers may only redeem rebates through either October 2011, or twelve months from the approval of the settlement, which occurs later. (Pls.' Mot., Ex. A.)

Second, Drèze assumed that the class members will be as likely as any other Honda owner to purchase another Honda. *See* Pls.' Resp. to Objs. at 11 (analysis is based on an estimate of "class members who would be purchasing a Honda in the next two years regardless of the existence of any settlement"). This figure not only disregards the existence of any settlement, but also the alleged facts underlying the claims in this suit. The class includes persons who believe they were misled about the fuel economy of their vehicle or were otherwise disappointed in the car they bought. *See, e.g.,* Major Obj. at 6 (noting Ms. Major is "disillusioned with Honda after [her] disappointment with the Civic hybrid mileage, and do[es] not wish

to continue to do business with Honda"). Some class members undoubtedly will purchase another Honda, *see, e.g.,* Def.'s Sub. at 2–3 (citing testimony of plaintiffs), but it appears unlikely that aggrieved HCH owners or lessees will make repeat Honda purchases at the same rate as Honda customers in general. Plaintiffs themselves seem to have recognized this concept, in that in negotiating the initial settlement agreement, they "assumed that Settlement Class Members dissatisfied with the fuel economy of their HCH would not be interested in purchasing another hybrid Honda vehicle." (Pls.' Mem. at 13.)

Even if the calculations at the first two steps of his analysis were reliable and accurate, though, the final step is particularly flawed. Drèze acknowledged that redemption rates in coupon settlements have ranged from less than one percent to over 90 percent, and therefore made estimates of likely redemption rates "based on a review of publically [sic] available evidence and scholarly writing on settlements." (Drèze Decl. ¶ 7.) Based on these unspecified sources, Drèze apparently concluded that 40% of those eligible for rebates under Option A and 20% of those eligible for rebates under Option B would redeem them. Applying these baseless figures, Drèze concluded that 7% of the total class will take advantage of Option A, and an additional 6% of the total class will take advantage of Option B. The Court is extremely skeptical of this outcome, particularly in light of the experience in other cases where less than 2% of the class redeemed similar rebates. *See, e.g., White v. Gen. Motors Corp.,* 835 So.2d 892, 896–97 (La.Ct.App.2002) (less than 1.7% of class redeemed coupons); Goldberg Obj., Ditlow Decl. ¶ 9, Att. A (settlement report from *Gray v. Ford Motor Co.,* Sacramento

---

data to the Court, both the Court and one of the Objector's experts, Clarence Ditlow, have

been able to, at least partially, reverse engineer Drèze's calculations.

Co. Sup.Ct. Case No. 03AS0391, June 26, 2009) (approximately .0075% of class redeemed coupons).[25]

◼ Drèze's analysis as to the value of the rebates to those class members who redeem them is also flawed, as he values the rebates at their full face value. (Drèze Decl., Att. 2.) Courts have generally rejected the idea that the face value of coupons or rebates should be used for settlement valuation purposes; "[c]ompensation in kind is worth less than cash of the same nominal value." *Acosta*, 243 F.R.D. at 390, quoting *In re Mexico Money Transfer Litig.*, 267 F.3d at 748. *See also In re GMC Pick–Up Litig.*, 55 F.3d at 807. Where a coupon or rebate is not freely transferable on the open market, as is the case here, it has even less value. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 221 n. 58 (D.Me.2003); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 RWS, 2002 WL 31663577, at *16 (S.D.N.Y. Nov. 26, 2002); *Clement v. Am. Honda Finance Corp.*, 176 F.R.D. 15, 27 (D.Conn.1997). *Compare In re Mexico Money Transfer Litig.*, 267 F.3d at 748 (analyzing value of transferable coupons).

Plaintiffs' argument that face value is the proper measure ignores the basic economics of coupons and rebates. "Coupons promote sales without lowering the price to everyone (that is, holding a 'sale')." *Menasha Corp. v. News America Marketing In–Store, Inc.*, 354 F.3d 661, 662 (7th Cir.2004). In the automobile context, "[r]ebates are given to encourage purchases by reducing the total amount of money the buyer needs to acquire the new

car or by providing the debtor a premium that can be used for some purpose other than acquiring the new car." *In re Gray*, 382 B.R. 438, 442 (Bankr.E.D.Tenn.2008). Since rebates and coupons aim to facilitate a sale to a purchaser who would not otherwise purchase a product at a higher price, the Court cannot, as Plaintiffs do, assume that every sale to a class member "would have happened anyway." (Pls.' Resp. to Objs. at 15.) Class members may purchase new Honda or Acura vehicles only "because they fe[el] beholden to use the certificates," not because they would have otherwise. *In re GMC Pick–Up Litig.*, 55 F.3d at 808.

The Court also notes that the coupons are not only worth less than face value to class members, but they cost AHM less as well. If many class members do in fact take advantage of the rebates offered by Options A and B, the Settlement can result in a "tremendous sales bonanza" for AHM. *In re GMC Pick–Up Litig.*, 55 F.3d at 808, quoting *Bloyed v. General Motors Corp.*, 881 S.W.2d 422, 431 (Tex.Ct.App.1994). For each class member who purchases another Honda or Acura who would not have done so without the settlement rebate, AHM will experience a net benefit.

These multiple flaws in Professor Drèze's analysis preclude the Court from giving it great weight. The Court concludes that although Options A, B, and C, have value, this value is far less than Plaintiffs suggest.

#### (b) The DVD

Plaintiffs also contend that the DVD offers benefits to the class of $7,427,477 to $29,709,911 "depending on actual fuel sav-

---

**25.** Plaintiffs claim the instant case is distinguishable from the cited cases, because the underlying claims in those cases were related to safety issues, not false advertising or fuel economy. (Pls.' Resp. to Objs. at 10.) While the Court agrees the cases are not identical, Plaintiffs have failed to identify any more analogous cases, and the Court thus finds this data to be the best available comparison point. Additionally, the Goldberg Objectors' expert, Clarence Ditlow, has stated, in his experience, redemption rates in comparable cases range from two to four percent. (Ditlow Decl. ¶¶ 9, 12.)

ings realized." (Pls.' Mem. at 13.) This calculation is based on an estimate that the class members who watch the DVD will obtain a fuel economy improvement of 15%, and thus an average savings in fuel costs of $125 per owner. (Cuneo & Chimicles Joint Decl. ¶ 17.) [26]

Many of the Objectors and the amici question the value of the DVD in light of the fact that many of the "tips" in the DVD are already available from free, public sources, as well as the HCH owners' manual. *See, e.g.,* AGs Amicus Br. at 8; Paduano Resp. to Mot. for Prelim. App. at 4–5; Major Obj. at 9; Goldberg Obj. at 7.[27] Plaintiffs do not dispute this fact, (Pls.' Resp. to Objs. at 4), but respond that the DVD is superior to these other sources for three reasons: (1) the DVD compiles the various tips that are otherwise available from scattered sources, including in various places in the HCH Owners' Manual, in a "user-friendly" way; (2) the DVD will include HCH-specific tips (Cuneo & Chimicles Joint Decl. ¶ 6); (3) many of the tips available free on the internet are unsafe or illegal (Cuneo & Chimicles Joint Decl. ¶ 5; Pls.' Resp. to Objs. at 2).

Even if Plaintiffs are correct that the DVD is superior to the free information already available to class members, the proper measure of the value of the DVD is not the total savings in fuel economy that a class member would achieve after viewing it, but the marginal value of these savings as compared to those a class member could achieve from viewing that which is already available to the class members, either on the internet or through the HCH Owners' Manual, plus any "convenience" value due to the "user friendliness" of the DVD.

The Court also is concerned that the DVD has yet to be "finalized," and AHM is not required to produce a script or story boards for the DVD until forty-five days *after* the settlement is given final approval. (Prop. Settlement at 14.) Not only will the Court lack jurisdiction to review the content of the DVD at that time, but, should fees be disbursed as proposed, class counsel will have been paid already, and thus have no incentive to review the proposed script or story boards meaningfully. Since the content of the DVD remains substantially uncertain, the Court questions how it or Plaintiffs can be assured the DVD will be of "substantial value" to the class members, or that "no single publicly available source contains *all* of the information to be presented in the DVD in one place." [28] (Pls.' Resp. to Objs. at 4 (emphasis in original).)

---

26. Plaintiffs also note "how to videos on the internet providing instruction on maximizing fuel economy claim to increase fuel efficiency by as much as 29% and can cost as much as $99 per video." (Cuneo & Chimicles Joint Decl. ¶ 8.) They explicitly disclaim this shows the value of the DVD, though, and merely note the existence of these videos as a "reference point." (Pls.' Resp. to Objs. at 5.)

27. The Goldberg objectors also question the decision to produce and mail a DVD to each class member, even though the video will also be available online in streaming in streaming video format. (Goldberg Obj. at 9–10.) Plaintiffs respond that mailing a DVD to each class member, as opposed to simply posting it online, will increase the likelihood that class members will watch the video and that the video will only be available online for a short period of time. (Cuneo & Chimicles Joint Decl. ¶ 5; Pls.' Resp. to Objs. at 5.) It is not the Court's place to determine if this decision is the best possible resource allocation, so long as it does not keep the settlement as a whole from being fair, adequate, and reasonable. The Court finds Plaintiffs' proffered explanation for this decision reasonable.

28. Notably, the Goldberg Objectors contend that most of the information in the parties' outline of the DVD actually is contained in one single, reliable website, the "*Gas Mileage Tips*" site published by the United States Environmental Protection Agency, http://www.fueleconomy.gov/feg/drive.shtml. (Goldberg Objs.' Resp. to Pls.' Mot. at 8.)

Although it is difficult for the Court to discern the value of the yet-to-be produced DVD at this time, the Court agrees with Plaintiffs that the DVD will likely be of *some* value to class members, who are concerned about improving fuel economy on their HCHs, but far less than the value assigned by Plaintiffs. This conclusion is significant in light of Plaintiffs' assertion that the class members who receive nothing but the DVD in this settlement (who, according to Plaintiffs' own expert, constitute 86% of the class), "will receive something of substantial value from the Settlement that directly addresses the primary issue raised in the Lawsuit." (Cuneo & Chimicles Joint Decl. ¶ 8.)

### (c) Injunctive Relief

Neither Plaintiffs nor Objectors have argued that the injunctive relief is a source of significant value to the class members, although AHM has. *See* Major Obj. at 10; Pls.' Resp. to Objs. at 8; Def.'s Sub. at 15. The Court is inclined to agree with Plaintiffs and the Objectors that the injunctive relief is of minor, if any, value. This is largely a byproduct of the nature of Plaintiffs' claims, though. No changes to future advertising by Honda will benefit those who already were misled by Honda's representations regarding fuel economy. In addition, due to regulatory changes by the Environmental Protection Agency, Honda has already substantially lowered the fuel economy estimates it uses in marketing and other customer communications. (*See* Pls.' Resp. to Objs. at 8.)

### (d) Attorneys' Fees and Incentive Payments

■ Although the Court does not rule on Plaintiffs' motion for attorneys' fees and incentive payments at this time, the Court still reviews the related provisions in the proposed settlement in determining the fairness of the proposal. "[T]o avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton,* 327 F.3d at 963.

The Court acknowledges that both representative plaintiffs' True and Delgado have been personally involved in this litigation. Although the Court does not make final determinations as to the appropriateness of the requested incentive fees at this time, the Court does not find these payments illustrate any flaw in the substantive terms of the proposed settlement agreement.

■ Plaintiffs' counsel seek an award of nearly three million dollars in attorneys' fees, based on a lodestar analysis and in accordance with a "clear sailing" provision in the proposed settlement agreement.[29] While the lodestar method of awarding fees is permissible under CAFA, the Court has the discretion to use either a percentage or lodestar method in awarding fees, and is particularly wary of using the lodestar method here. *See Hanlon,* 150 F.3d at 1029; *Fleury,* 2008 WL 3287154, at *2–*3. The lodestar amount is particularly inappropriate where, as here, the benefit achieved for the class is small and the lodestar award large. *See, e.g., Create–A–Card, Inc. v. Intuit, Inc.,* No. C 07–06452 WHA, 2009 WL 3073920 (N.D.Cal. Sept. 22, 2009).

---

**29.** A clear sailing fee provision is one "where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *Nienaber v. Citibank (S.D.) N.A.,* 2007 WL 2003761, at *1 n. 1 (D.S.D. July 5, 2007), *quoting Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 520 n. 1 (1st Cir.1991).

■ The size of the fee request also raises concerns in light of the fact that it was negotiated at the same time as the substantive relief to the class. "Ordinarily, 'a defendant is interested only in disposing of the total claim asserted against it ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense....'" *Staton*, 327 F.3d at 964, *quoting In re GMC Pick–Up Litig.*, 55 F.3d at 819–20. Where the class payment and fees are negotiated together, there is thus a concern that class counsel engaged in "a tradeoff between merits relief and attorney's fees." *Id. See also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328 (9th Cir.1999). The Court does not suggest any intentional fiduciary breach by class counsel, but "even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." *Staton*, 327 F.3d at 964, *quoting Court Awarded Attorney Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237, 266 (1985).

■ Here, of all the components of the settlement, the only components with any determinate value are the attorneys' fees and incentive payments. Under the terms of the settlement, there is no certainty that class members will receive any cash payments or rebates at all, but class counsel will receive a three million dollar payment regardless of whether one or 10,000 class members file valid claims. Since there is no guarantee that AHM will pay *any* money out of the settlement to either class members or a cypress beneficiary, to award three million dollars to class counsel who may have achieved no financial recovery for the class would be unconscionable.

The Court concludes that the Plaintiffs have significantly overestimated the value of the settlement at $23.6 to 45.9 million. According to AHM's published information, the cheapest 2010 Honda available costs $15,610.[30] For most class members, the settlement thus amounts to, at best, a 6.5% discount off the purchase of a new car, redeemable only within the next nineteen months, just a few years after they purchased or leased a new Honda. According to Plaintiffs' own expert, this discount will only be redeemed by 14% of the class, leaving 86% of the class with nothing more than a DVD of little value. The Court has grave doubts as to the adequacy of the value of such a settlement of Plaintiffs' colorable claims, particularly in light of the three million dollar fee request. The Court thus finds the value of the settlement weighs against approval.

### 5. The Extent of Discovery Completed, and the Stage of the Proceedings

■ Plaintiffs filed this action on March 9, 2007. Over a two-year time span, class counsel reviewed "thousands of pages of relevant documents" produced by AHM and third parties, "took four depositions of AHM executives and third parties including AHM's advertising agency, RPA [Rubin Postaer and Associates]," and engaged various experts "to assist them in the review and analysis of information obtained through discovery." (Pls.' Mem. at 14.) The Court concludes discovery has been sufficient to permit the parties to enter into a well-informed settlement, and this factor weighs in favor of approval.

### 6. The Experience and Views of Counsel

■ As explained above, class counsel have demonstrated experience with class

---

**30.** The 2010 Honda Fit with a manual transmission has a base price of $14,900, plus a mandatory $710 destination and handling fee.

*2010 Honda Fit—The Official Honda Web Site,* http://automobiles.honda.com/fit/.

action and complex litigation. Class counsel have indicated that they support the proposed settlement, as "based on the strengths and weaknesses of the case and the uncertainties inherent in further litigation, the settlement is fair, reasonable and adequate." (Cuneo & Chimicles Decl. ¶ 3.) This factor thus weighs in favor of approval.

### 7. The Reaction of the Class members to the Proposed Settlement

 The Court has the benefit of the views of numerous class members here: objectors, class members who opted out, and other class members who submitted communications to class counsel or the Settlement Administrator. The Court summarizes these varied views before discussing whether the reaction of class members as a whole weighs in favor of settlement.

#### (a) The Views of the Objectors

As noted above, sixteen class members, including the State of Texas, have "objected" to the settlement. The Court has also received an amicus brief filed on behalf of 26 state officials opposing the settlement as insufficiently beneficial to class members. The Court addresses the views of the various states and state officials separately below.

"In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors." *In re GMC Pick–Up Litig.*, 55 F.3d at 812. *See also Pallas v. Pacific Bell*, No. C–89–2373 DLJ, 1999 WL 1209495, at *6 (N.D.Cal. July 13, 1999) ("The greater the number of objectors, the heavier the burden on the proponents of settlement to prove fairness."). "However, a combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticat-

ed settlement." *In re GMC Pick–Up Litig.*, 55 F.3d at 812, *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217–18 (5th Cir.1981); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir.1979). "[A] low number of objectors is almost guaranteed by an opt-out regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co., L.P.*, 527 F.Supp.2d 439, 446 (W.D.Pa.2007).

Although some of the Objectors' arguments are more helpful than others, the Objectors here have raised serious, legitimate concerns about the adequacy of the proposed settlement. Nevertheless, Plaintiffs suggest the Court should disregard their opposition to the proposed settlement. (Pls.' Resp. to Obj. at 15–18.)

First, Plaintiffs attack many of the Objectors' counsel because they have represented objectors in other actions in the past. (*Id.* at 17.) This has no greater bearing on the merits of the objections raised than a plaintiff's counsel's experience in filing class action suits speaks to the merits of claims he brings.

Second, Plaintiffs suggest that the Court should not give weight to the objections of the Goldberg objectors, as they are all attorneys. (Pls.' Resp. to Objs. at 17). Plaintiffs cite no authority for this proposition, and the Court sees no reason why it should give less consideration to the views of any class member simply because of his or her profession.

Third, Plaintiffs contend some of the Objectors are opposed to class action litigation in general, not this specific settlement. (*Id.*) The Court does not give any weight to arguments about the propriety of class action litigation, but the views of Objectors or their counsel on that subject does not discredit the points they have

made relating to the substance of this settlement.

Fourth, Plaintiffs suggest that the objections are entitled to little credence because the Objectors did not make suggestions as to how to make the settlement better. (*Id.*) This argument is unavailing for two reasons. The proponents of a settlement bear the burden of proving its fairness. 4 *Newberg on Class Actions* § 11:42 (4th Ed.2009). Objectors do not have a duty to produce a fairer alternative. Even so, the Objectors here did explicitly note elements of the proposed settlement that could be made fairer (e.g., the release language, the limitation on rebate-eligible Honda models), and the parties responded by making changes to the proposed settlement.

Finally, Plaintiffs also argue that the Objectors' views should not weigh against approval of the settlement, since the Objectors had the option to opt out of the settlement. (Pls.' Resp. to Objs. 18.) This argument was specifically rejected by the Third Circuit in *In re GMC Pick–Up Litig.* Responding to an argument that class members "dissatisfied with the settlement's terms [ ] could simply opt out of the class and pursue their own relief individually," the court explained:

> While such an argument might theoretically be true, it ignores the realities of pursuing small claims. It would cost considerably more to litigate individual claims than the litigant could recover … At all events, the right of parties to opt out does not relieve the court of its duty to safeguard the interests of the class and to withhold approval from any settlement that creates conflicts among the class.

55 F.3d at 809. The Court agrees with this reasoning, and thus has considered the views of the objectors on the merits.

Of the formal objections lodged with the court, each expressed dissatisfaction with the suit as substantively unfair based on the insufficient relief offered.[31] Many of

---

31. The Court notes that one objector, Francine P. Peterman, requests "to serve a limited number of narrow and carefully drafted Requests for Production and Interrogatories upon the Defendant." (Peterman Obj. at 7.) Through this discovery, Peterman seeks to explore four issues: (1) the conduct of class counsel in settlement negotiations, (2) class counsel's time and expenses in the case, (3) the value of the benefit that class members will receive, and (4) "why is there no monetary benefit for any member of the class?" (Peterman Obj. at 7–8.)

"Class members who object to a class action settlement do not have an absolute right to discovery; the Court may, in its discretion, limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement." *Hemphill v. San Diego Ass'n of Realtors,* 225 F.R.D. 616, 619 (S.D.Cal.2005). Here, Plaintiffs have already produced sufficient evidence for the Court to evaluate the value of the relief for class members in the proposed settlement, and thus further discovery is unnecessary. The Court further finds no additional discovery is needed as to class counsels' time and expense in this case, in light of the evidence produced in connection with the motion for attorneys' fees and the Court's deferral of any issues regarding fees to a later date.

Peterman's requests for discovery about class counsel's conduct during settlement negotiations, as well as "why" monetary relief did not form a greater part of the settlement are evaluated under an even stricter standard. An objector is only entitled to discovery of settlement negotiations if he or she "lays a foundation by adducing from other sources evidence indicating that the settlement may be collusive." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1148 (9th Cir.2000). *See also Horton v. USAA Casualty Ins. Co.,* No. CV 06–2810–PHX–DGC, 2009 WL 2372187, at \*2 (D.Ariz. Aug. 3, 2009); *Hemphill,* 225 F.R.D. at 621. While the Court agrees with the Objectors that there are issues as to the fairness of the settlement, there is no evidence that there was improper collusion between the parties, and thus the request for discovery is DENIED.

the specific arguments raised are now moot, as they concern features of the settlement that the parties have modified. *See, e.g.,* Peterman Obj. at 3 (arguing that members of the Option C sub-group should be able to obtain both a coupon under Option A or B and the $100 cash payment under Option C); Major Obj. at 4 (addressing requirement that class members watch video prior to completing claim form); Major Obj. at 5 (addressing limitation of rebates to purchases of more expensive Honda and Acura models). The Court has addressed the remaining meritorious objections throughout this Order.

Of the objections submitted solely to class counsel, one objected solely to the attorneys' fee award (Pls.' Resp. to Obj., Ex. A at 2–4); four objected on the grounds that the case was frivolous or that they were satisfied with their fuel economy (*id.* at 5–9, 16–33); and one objected to the inadequate remedies, excessive attorneys' fees, and breadth of the settlement (*id.* at 10–15).

### (b) The Views of the Opt-Out Class Members

Five hundred eighty-four members of the class submitted opt-out forms to the Settlement Administrator. (Pls.' Mem. at 18; Lifosjoe Decl. ¶ 19.)

Many of the opt-out notices included comments on the terms of the proposed settlement. The Court has reviewed these comments. Several class members cited their own inability to benefit from the settlement, as they had not formally filed complaints with Honda or had no intention of purchasing one of the specified Honda vehicles, and thus would not qualify for Options A, B, or C. *See, e.g.,* Opt–Out Nos. 1, 93, 199 204, 240, 544, 550, 555, 558, 559, 561, 563, 564, 565, 566, 570, 571, 579, 580. Many class members cited the attorneys' fee request as too high. *See, e.g.,* Opt–Out

Nos. 34, 81, 176, 276, 535, 536, 539, 550, 567, 577, 578. Others stated that the relief provided was generally of insubstantial or insufficient benefit. *See, e.g.,* Opt–Out Nos. 535–538, 540, 541, 543–545, 549, 551, 560, 570, 572, 574, 577, 578, 580–582. One class member argued the incentive payment award was too high. Opt–Out No. 539.

The majority of the class members who opted-out and provided comments, though, cited their satisfaction with the gas mileage they were receiving from their HCHs, or otherwise opposed the merits of the suit.[32] *See, e.g.,* Opt–Out Nos. 5–15, 17–24, 26, 29, 31, 34–45, 47–51, 53–64, 66–73, 75–79, 81, 83, 85–90, 92, 94–96, 98, 99, 101, 103, 105, 106, 108–113, 115–119, 121–132, 134–135, 136, 138, 141–143, 145–153, 155–160, 162–173, 175, 177–181, 183–186, 188–191, 193–198, 201–203, 206–208, 210–220, 224–235, 238–239, 241–243, 247–249, 251–261, 264, 268–286, 288, 290–291, 293–310, 313–327, 330, 332–339, 341–345, 347–350, 352–363, 365–380.

Plaintiffs contend that only one opt-out submission "clearly expressed a desire to commence an individual lawsuit." (Pls.' Mem. at 18.) The Court has identified several submissions, though, which, either explicitly or in tenor, contemplate individual suits. *See, e.g.,* Opt–Out Nos. 35 ("I would like to consider my options outside the terms contained in the settlement offer."); 542 ("I may be suing Honda myself."); 549 ("Considering legal action against Honda on my own"); 552 ("I will seek my own legal action as this settlement offer is completely inadequate.") Therefore, the Court cannot conclude that there is no "threat of individual lawsuits against AHM based on the same claims in this Lawsuit," as Plaintiffs have. (Pls.' Mem. at 18.)

---

**32.** One objector appeared at the fairness hearing and made this same argument.

#### (c) Views Expressed by Other Class Members

The Court has reviewed six letters submitted to the Settlement Administrator which provide substantive comments on the settlement. Three of these letters expressed opposition to the merits of the lawsuit, based on the authors' experiences driving HCHs and achieving the advertised fuel economy. (Other Communication Nos. 5, 6, and 14.) Another letter writer also expressed his own experience achieving the advertised fuel economy, but asked the Court to require Honda to make unrelated changes to HCHs as part of any settlement. (Other Communication No. 18.) One letter writer explicitly objected to any settlement that would provide any relief to the class or class counsel. (Other Communication No. 16.) One letter writer objected to the terms of the settlement on the bases that the settlement did not assist class members "in any meaningful way" and "will cause a chilling effect ... with regard to the implementation of new energy efficient technology," and that the attorneys' fees requested are too high. (Other Communication No. 1.)

The Court has also reviewed other communications from class members sent directly to class counsel. Two letter writers found the relief offered insufficient (Pls.' Resp. to Objs. at 35, 37–38); two letter writers expressed their belief that there was no merit to the suit (*id.* at 36, 44); and one letter writer expressed disdain for class action suits in general (*id.* at 39–43).

#### (d) Analysis

Although the Objectors have identified significant issues relating to the value of the settlement and the fairness of the distribution of its relief, the Court notes that a large number of class members appear to think that the settlement is *more* than fair to the class, since they believe the case has no merit whatsoever. Therefore, this factor is at least neutral, but more likely weighs in favor of approval of the proposed settlement.

#### 8. Presence of a Governmental Participant

■■■ Twenty-six states have filed an amicus brief urging the Court to reject the proposed settlement as unfair. The State of Texas has also objected as a class member. This factor thus weighs against approval of the settlement.

The Court concludes that the differential treatment of class members, the low value of the settlement, and the views of the governmental participants outweigh those factors that weigh in favor of approval. The Court thus cannot find the proposed settlement to be "fair, reasonable and adequate" under either Rule 23(e) or 28 U.S.C. § 1712(e).

### C. Notice

■■■ Even if the Court were to find the substance of the proposed settlement fair, adequate, and reasonable, the Court could not grant final approval of the settlement at this juncture. The only notice sent to class members contained the terms of the initial proposed settlement, to which the parties have agreed to make several substantive changes. These changes, particularly the change as to which Honda vehicles are eligible for a rebate, may have an effect on the decisions of the Objectors and opting-out class members. *See, e.g.,* Opt–Out Nos. 67 (noting no intent to buy one of the eligible vehicles); 566 (same). Thus, the parties should have sent notice of the revised settlement to at least these class members. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 473 n. 10 (D.N.J.1997). *Compare White v. Nat'l Football League,* 41 F.3d 402, 408 (8th Cir.1994), *abrogated on other grounds by Amchem Prods., Inc.,* 521 U.S. at 620, 117 S.Ct. 2231, (notice of revised settlement sent to entire class pri-

or to final approval hearing); *Sylvester v. CIGNA Corp.*, 369 F.Supp.2d 34, 43 (D.Me. 2005) (same); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F.Supp.2d 184, 186 (D.Me.2003) (notice of revised settlement sent to objectors and opt-outs); *In re Auction Houses Antitrust Litig.*, 138 F.Supp.2d 548, 549 n. 3 (S.D.N.Y.2001) (notice of revised settlement sent to all objectors).

In addition, the parties only sent notice of the revisions to the proposed settlement to the Attorneys General of each of the fifty states and the District of Columbia on February 12, 2010. (Kiser Supp. Decl. ¶ 3.) A mailing sent only ten days prior to the final approval hearing cannot possibly give adequate notice to the Attorneys General in order to achieve the purposes of 28 U.S.C. § 1715(b). This delay makes it questionable whether the Court even has the authority to issue an order giving final approval to the proposed settlement in light of 28 U.S.C. § 1715(d), which states: "An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b)." While the text of this section is unclear as to its application to revisions of proposed settlements, the Court finds the mailing inadequate under any measure of reasonable timing.

### D. Attorneys' Fees and Incentive Payment for Named Plaintiffs

In light of the Court's denial of the motion for final approval of the settlement, Plaintiffs' motion for attorneys' fees is denied without prejudice as premature.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Final Approval of the Settlement and Motion for Attorneys' Fees and Incentive Payments are DENIED without prejudice.